THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
JAMIE L. RIXIE, Defendant-Appellant.

Second District   No. 2—86—1157

Opinion filed October 24, 1989.

G. Joseph Weller, Michael F. Braun, and Beth Katz, all of State Appellate Defender's Office, of Elgin, for appellant.

Paul Logli, State's Attorney, of Rockford (William L. Browers and David A. Bernhard, both of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE McLAREN delivered the opinion of the court:

Defendant, Jamie Rixie, appeals from his conviction of felony murder and the subsequent sentence imposed. Rixie was found guilty

after a jury trial, and the court sentenced him to an extended term of 60 years' imprisonment.

Rixie, along with Victor Ganus, was charged by indictment with one count of murder (Ill. Rev. Stat. 1985, ch. 38, par. 9—1(a)(1)) and one count of felony murder (Ill. Rev. Stat. 1985, ch. 38, par. 9—1(a)(3)). These charges stem from the armed robbery and murder of Richard Misslich on May 1, 1985. On October 24, 1985, the court granted a motion for severance, and Rixie was tried separately.

Prior to trial, Rixie filed a motion to quash the search warrant and suppress evidence seized pursuant thereto. Several officers of the Rockford police department testified at the hearing on the motion. The officers executed a search warrant for the defendant's home at 2716 Bildahl Street in Rockford, on May 2, 1985. Detective Erickson stated that he was instructed to find anything with blood on it, or that could be used as a weapon. Officer Anderson testified that the warrant authorized a search for blood, fibers, hairs, and weapons. Discretion was used in determining what items to seize according to Anderson. The items seized included: a footstool; a brown-flowered drape; a piece of gauze cloth; a gray jacket; an upholstery button; two newspapers; a pair of brown and black shower shoes; a piece of wooden board; a broken window shade; a Phillips screwdriver; pieces of a broken bottle; a butcher knife; an empty Clorox bleach bottle; and a pillow. The court did not allow the motion to quash but did suppress the brown-flowered curtain that was seized.

The defendant also filed a motion *in limine* seeking to exclude evidence of his prior conviction of robbery. The court denied this motion. Defendant also presented a motion *in limine* seeking to prevent the testimony of Terry Delemeter insofar as his testimony referred to Rixie placing a knife to Delemeter's throat in order to collect a long-standing debt. The court granted this motion and held that the State was precluded from eliciting testimony regarding threats directed at an individual in an unrelated matter.

The case proceeded to trial on June 27, 1986. Detective Rinehart testified that he went to Levings Lake on the morning of May 1, 1985, and found the body of Misslich. He removed certain items from the area around the body, including: socks, a shirt, a strip of cloth, a drape and a pair of shoes. Dr. William Rouse, a forensic pathologist, testified that when Misslich's body was discovered, his upper body was unclothed and there were numerous stab wounds and lacerations to his upper body, including his head, face and neck. A bite mark was also discovered on one of Misslich's arms. Dr. Rouse also found marks on either side of the mouth and on both wrists which indi-

cated that there had been some type of ligature or binding in those areas. The configuration of the stab wounds supported the theory that they had occurred in rapid succession. Additionally, some of the wounds could have been caused by a screwdriver, although it was more probable that they were caused by some type of knife.

Mrs. Wanda Ganus, Victor's mother, testified that she saw Rixie on the morning of May 1, 1985, with her son. She testified that Victor told her he and Rixie had killed a man the night before. Victor stated that both he and Rixie were drunk and on drugs, and they stabbed a man at least 25 times each. Wanda stated that she asked Rixie if this was true, and he responded that it was. After hearing reports of a killing on the 5 o'clock and 10 o'clock news that night, Wanda Ganus notified the police. She also testified that there was blood on Rixie's head when he was at her house on May 1, and she knew that he had been stabbed.

On cross-examination, Mrs. Ganus testified that she had given a statement to Rockford police on May 2, 1985. She admitted that there was nothing in her earlier statement which indicated that Jamie Rixie had acknowledged the truth of Victor's statements. Mrs. Ganus further testified that she had twice pleaded guilty to misdemeanor theft charges: in September 1982 and again in August 1986.

Bruce Williams testified that he lived in a duplex adjoining Jamie Rixie's apartment on May 1, 1985. Williams testified that at 12:15 a.m. there was a loud "bang" on the wall. At 2:15 a.m., he was awakened and heard a yell that was muffled. He went back to sleep. Later that day, he saw Rixie and another male packing items into a car.

Rose Frickson, Williams' roommate, also testified. She stated that she heard Rixie say, "Let's go kick his ass" at about 2 a.m. on May 1, 1985. Frickson next heard a loud, then muffled, yell. She testified that she was able to hear the conversation in the next apartment because the walls were thin. On cross-examination, Frickson stated that she did not mention overhearing this conversation when questioned by police on May 2.

FBI agent Timothy Rembijas testified that he arrested Rixie on May 14, 1985, in Brookport, Illinois. Rembijas stated that Rixie was read his *Miranda* warnings after being placed in the agent's car, and he understood them. Upon arrival at the Massac County sheriff's department, Rixie indicated that he wanted to tell the officers what had occurred, and he signed a waiver of rights form.

According to Rembijas, Rixie then described the events of May 1, 1985. Four men were at Rixie's apartment drinking beer for several

hours. One of the men wished to go home. They all got into a car and started driving toward the man's house when Victor Ganus stated that he wanted to go to a bookstore. They dropped him off, and he told them to wait. When he did not return right away, Rixie went inside to look for him. Unable to find Ganus, Rixie left the bookstore, but the others had driven away. Rixie waited a little while for Ganus and then hitched a ride home with an acquaintance who happened by. When Rixie returned home, Ganus was there with a middle-aged man whom Rixie did not know. Ganus pulled Rixie aside and suggested robbing this person. Ganus then jumped the man. The man retrieved a screwdriver from a nearby tool box and attacked Rixie with it. Rixie stated that he was stabbed twice in the head and once in the ear.

Together, Ganus and Rixie stopped the attack on Rixie, and Rixie admitted to stabbing at the man, possibly striking him once or twice in the chest. Rixie also stated that he bit the man on the wrist in defending himself. Rixie then became aware of blood running down the front of his face and went into the bathroom to tend to his wounds. After a few minutes in the bathroom, Rixie went back to the living room. The man was either unconscious or dead according to Rixie, and there was a great deal of blood everywhere. Ganus then suggested taking the man to a park. Ganus took the man's wallet. They cleaned the apartment and put the towels, clothes and screwdriver in a nearby dumpster.

After seeing a news report about the incident, Rixie became frightened and went to Brookport to stay with his grandparents. Rixie told the agents that there was no premeditated plan to pick up a homosexual and rob him.

On cross-examination, Rembijas stated that Rixie indicated the man was fully clothed and neither bound nor gagged at any time. Rembijas acknowledged that Rixie had a somewhat healed-over head wound and pointed out the scar in a photograph of Rixie taken May 14, 1985.

Detective Muenkel testified that he recovered a social security card, a wallet with identification for Richard Misslich, a brown throw rug, a screwdriver, a blue nylon jacket, some material, a pair of Nike tennis shoes, a red pullover shirt, a pillowcase, a bath towel, and a hand towel from a dumpster located about six blocks from Rixie's residence. The towels smelled of bleach, and the jacket, pillowcase, tennis shoes and hand towel appeared to have blood on them.

Terrence Delemeter, testifying for the State, stated that he had known Rixie for approximately two years. Delemeter testified that

on May 1, 1985, he and Melanie Lundblade were with Darryl Birmingham driving around in Birmingham's car. The three stopped at a convenience store to buy some beer, and they saw Rixie and Ganus in the parking lot. Birmingham asked Ganus to purchase some beer for them, and he did so. The five of them then proceeded to Rixie's apartment, where they drank beer for about 1½ hours. During that time, Delemeter testified that Ganus started talking about the fact that he needed money. It was during this discussion that Ganus mentioned the idea to "rob a fag." On the way to the adult bookstore, Delemeter exited the car to meet his girlfriend.

On cross-examination, Delemeter stated that he was detained for questioning on this matter due to outstanding arrest warrants. He had previously been convicted of burglary and forgery. Delemeter further testified that he was awaiting treatment for drug addiction. Delemeter also testified that a detective told him he would sit in jail for the warrants unless he agreed to discuss Rixie and Ganus and, if he cooperated, he would be given a recognizance bond. He stated that Ganus was acting wild and talking about how he was going to end up back in the penitentiary. It was Ganus who brought up the subject of money and initiated the idea of committing a robbery. Delemeter also stated that when Rixie drank he would talk tough, but that no one ever took him seriously. Delemeter further testified that he was not afraid of Rixie. While Ganus was discussing the possibility of being dropped off at a "fag" bar, Rixie wanted to find out if there was a party at another acquaintance's house. Delemeter also testified about an incident that occurred earlier in the evening. Rixie approached Delemeter at the convenience store, put a pocket knife near his neck, and demanded repayment of a $5 debt. Ganus intervened, and Rixie stated that he was not serious. Immediately thereafter they all went to Rixie's apartment to drink.

Following Delemeter's testimony, and outside the presence of the jury, defense counsel asserted that the Rockford police officers had been instructed not to speak with Rixie's attorneys prior to testifying. A hearing was held after which the court found that there was "a sufficient showing somebody believes from the police department that they are not to talk or an official order from somebody not to talk to defense attorneys." The court further acknowledged that there was such an impression on the part of the officers, "[w]hether it came from misunderstanding or otherwise." The defense motion for a mistrial based upon this situation was denied. The State was ordered to rectify this situation.

Darryl Birmingham's testimony substantially corroborated that of

Delemeter. He stated that Rixie told him that he had to go to the penitentiary at the end of May and he might as well make a life out of it. Birmingham further stated that after Delemeter exited the car, he, Lundblade, Ganus and Rixie proceeded to the adult bookstore on Seventh Street. Ganus instructed Birmingham to follow him if Ganus got into another car with someone. Ganus then went inside the bookstore. When Rixie went into the bookstore to find Ganus approximately 10 to 15 minutes later, Birmingham and Lundblade drove away. The State rested after this evidence.

William Morrison, a former police officer and legal investigator, was the first defense witness. He testified that he was present when defense counsel interviewed Birmingham. Birmingham told them that Rixie was drunk during the early morning hours of May 1, 1985. Further, Morrison indicated that Birmingham stated Ganus was the instigator of the plan to go to the bookstore and rob a homosexual. Morrison further testified that Birmingham stated that Rixie got out of the car to find Ganus and there had been no agreement between Ganus and Rixie to rob or kill anyone. According to Morrison, Birmingham acknowledged that Jamie had been drinking and said that, when Jamie drank, he tried to talk tough and make people think he was a very tough person.

Sheldon Walling was a sales clerk at the adult bookstore on Seventh Street on May 1, 1985. He stated that he knew Richard Misslich as a customer of the bookstore and had seen him once every week or two since November 1984. On the morning of May 1, 1985, Misslich entered the bookstore alone. He saw Misslich by the magazine display talking to a man who had entered the store about 15 minutes later. This man was identified as Ganus. The two men went into a movie room together and then left the store 10 to 15 minutes later. David Replogle, a friend of Sheldon Walling, testified that he saw Ganus and Misslich enter a movie booth together also. After leaving the bookstore, Replogle saw Misslich enter a car and Ganus enter a different car. After approximately 30 seconds to a minute, Ganus then got out and went to Misslich's car and entered it. The men then drove away together.

Rixie testified on his own behalf. Rixie testified that he had known Ganus for approximately five or six years. Ganus had spent 3½ years in the penitentiary and had only been out a few weeks on May 1, 1985. Rixie testified that Ganus spent the night of April 29 in Rixie's apartment, and the two men spent the afternoon of April 30 riding and repairing Rixie's motorcycle and drinking wine. Eventually the motorcycle broke down, and Ganus purchased a bottle of

Southern Comfort and a 12-pack of beer after forging a check for $15. The two men consumed quite a bit of liquor that day, and Rixie stated that Ganus was trying to start fights. Rixie was able to borrow $6 from a friend, and the two men purchased two more bottles of wine. Rixie and Ganus consumed the wine and went riding around in a friend's car until approximately 11:30 p.m. Ganus suggested robbing the Stop-N-Go, but Rixie told him he was crazy. On the way back to Rixie's apartment, they saw Delemeter, Birmingham and Lundblade. These were people Rixie knew from parties, and Rixie reminded Delemeter of the outstanding $5 debt. Delemeter said that he had no money, and, even if he did, he would not give it to Rixie. Rixie testified that he showed Delemeter a pocket knife and said, "I bet you I can get that $5." Rixie stated that he put the knife close to Delemeter, but was not serious and did not try to hurt him. They purchased a 12-pack of beer, and all five people proceeded to Rixie's apartment.

Rixie testified that he and Ganus were drunk that night. Rixie testified that Ganus stated if he wanted to make a quick dollar all he had to do was "go to a fag bar and pick a fag up and roll him." Rixie testified that he then told the group that Ganus had earlier suggested robbing the Stop-N-Go as well, but that Rixie had responded he was in enough trouble already. Rixie testified that he had previously been convicted of robbery. Rixie was on probation at the time of the instant events and was supposed to have enrolled in an alcohol program, although he had not done so. When the group left Rixie's apartment, Delemeter wanted to be dropped off near his girlfriend's hotel, and Rixie wanted to see about a party on the west side of Rockford. After dropping Delemeter off, they did drive toward the west side.

Rixie's testimony regarding the facts and circumstances surrounding the stabbing incident was consistent with the statement given on the day of his arrest, as testified to by Agent Rembijas.

Rixie further testified that Ganus never spoke to his mother about the incident in Rixie's presence. Rixie testified that he did not agree to any type of a robbery scheme with Ganus, and he participated in disposing of the body only because he was scared and did not know what else to do. The defense rested.

Following the initial instructions conference, the court agreed to instruct the jury on the lesser-included offenses of murder. The jury was to consider those verdicts, and, if a verdict of guilty was returned on voluntary manslaughter or another lesser offense, the jury was not to consider the second count of felony murder. The State

then dismissed count I. Defense counsel's subsequent motion for a mistrial was denied. Despite the dismissal of the charge of murder set forth in count I, defense counsel proffered jury instructions pertaining to lesser-included offenses based upon the evidence adduced at trial. These instructions were refused. The jury returned a verdict of guilty of felony murder.

Rixie was found to be eligible for the death penalty following a hearing on August 21, 1986. A sentencing hearing was held in which evidence in aggravation and mitigation was presented. After consideration of all the evidence, the court imposed an extended sentence of 60 years' imprisonment. (Ill. Rev. Stat. 1985, ch. 38, par. 1005—8—2(a)(2).) Defendant filed a motion for a new trial, which was denied. The defendant also filed a post-sentencing motion which was similarly denied. Defendant appeals from the denial of these motions.

■ The first issue raised is whether the court erred by admitting evidence of defendant's prior conviction of robbery. The trial court is to exercise its discretion in admitting evidence of a prior conviction for the purpose of impeaching a witness' credibility. (*People v. Montgomery* (1971), 47 Ill. 2d 510, 515; *People v. Powell* (1985), 139 Ill. App. 3d 701, 707.) The trial court is given wide latitude in exercising this discretion. (*Powell*, 139 Ill. App. 3d at 708.) In Illinois, evidence of a prior conviction may be introduced if the prior conviction is for a crime punishable by imprisonment in excess of one year, and less than 10 years have passed since the conviction or the witness' release from confinement. (*Powell*, 139 Ill. App. 3d at 707.) Once it is established that the prior conviction falls within the class of convictions outlined above, the court must weigh the prejudicial effect of admitting evidence of the prior conviction against the probative value. (*Montgomery*, 47 Ill. 2d at 517.) Factors for consideration by the trial court are the nature of the crime, the nearness in time of the prior conviction to the present trial, the subsequent career of the defendant, and the similarity of the crimes. *People v. Evans* (1981), 92 Ill. App. 3d 874, 878.

■ Defendant does not contest the fact that his prior conviction of robbery falls within the class of convictions that may be admitted for impeachment purposes. However, defendant argues that since the prior conviction was of robbery, and the underlying felony in this matter is armed robbery, the crimes are similar. Therefore, admission of the prior conviction would be unduly prejudicial.

The fact that the prior conviction and the present charge are similar does not prohibit the prior conviction from being admitted of impeachment purposes. (*Evans*, 92 Ill. App. 3d at 878.) In *Evans*,

this court upheld the admission of a prior conviction for manslaughter in a murder trial. We noted that the trial judge considered the relevant factors and, in addition, gave the jury a limiting instruction advising the jurors to only consider the evidence as it bears on the defendant's credibility. Therefore, we found that the trial court did not abuse its discretion in admitting evidence of the prior conviction even though it was for a similar offense. *Evans*, 92 Ill. App. 3d at 878.

It is clear the trial court in the case at bar considered the relevant factors. While noting the similarities in the offenses, the court placed emphasis on the fact that the charged offense occurred within approximately one year of the prior conviction. We do not find that emphasizing this factor was an abuse of discretion. Additionally, the court instructed the jury to consider this evidence only for impeachment purposes. We believe that the court carefully balanced the probative value of the prior conviction against the prejudice to defendant and did not abuse its discretion in admitting the evidence.

The next issue raised is whether the trial court erred in denying defendant's motion to quash the search warrant and suppress the evidence seized. Defendant contends that the search warrant issued in this case did not identify the items to be seized with sufficient particularity and, therefore, the warrant must be quashed and the evidence suppressed.

■■ A search warrant must particularly describe the place to be searched and the items to be seized. (U.S. Const., amend. IV; Ill. Const. 1970, art. I, §6; Ill. Rev. Stat. 1985, ch. 38, par. 108–7.) Whether a warrant satisfies the requirements of particularity is determined on a case-by-case basis. (*People v. Allbritton* (1986), 150 Ill. App. 3d 545, 547.) The degree of particularity required varies with the nature of the case and the material or items to be seized. *People v. Casillo* (1981), 99 Ill. App. 3d 825, 828.

In *People v. Wolski* (1980), 83 Ill. App. 3d 17, authorities were investigating a murder. The victim's partially clothed body was discovered in a field approximately 60 feet from a road. It appeared that she had been struck on the head with a blunt instrument. A credit-card receipt bearing the defendant's signature was found near the body. A search warrant was obtained authorizing the police to search the defendant's person, home and automobile and to seize:

> "[B]lood, articles of clothing with blood or male or female secretions theron [*sic*], jewelry and other personal items formerly in possession of [the victim], hair from the head of [the victim], dirt, grass on [*sic*] other materials or things from the

area where the body of [the victim] was found. fingerprints [*sic*] of [the victim]." (*Wolski*, 83 Ill. App. 3d at 23.) This court held that the warrant described the items to be seized with as much exactitude as was possible at that stage of the investigation. *Wolski*, 83 Ill. App. 3d at 23.

In *People v. Mitchell* (1978), 61 Ill. App. 3d 99, the police discovered the deceased victim at her home after her daughter expressed concern as to her well-being. The victim's daughter then implicated her ex-husband, the defendant, in the murder. The police obtained a warrant to search the defendant's home. The search warrant authorized the seizure of "any clothing, weapons, instruments, articles or contraband which have been used in the commission of or which constitute evidence of the offense of murder." (*Mitchell*, 61 Ill. App. 3d at 100.) The court found that a detailed description of the items sought was impossible under the circumstances, and a characterization in more general terms was sufficient. *Mitchell*, 61 Ill. App. 3d at 102; see also *People v. Raicevich* (1978), 61 Ill. App. 3d 143, 147 ("When circumstances such as presented in this case make an exact description of items a virtual impossibility, the searching officer can only be expected to describe the generic class of items he is seeking").

Defendant cites *Stanford v. Texas* (1965), 379 U.S. 476, 13 L. Ed. 2d 431, 85 S. Ct. 506, and *Allbritton* (150 Ill. App. 3d 545), as support for his contention that the specificity requirement has not been satisfied in this case. Both of these cases are factually distinguishable.

In *Stanford*, the defendant was suspected of violating a Texas statute basically outlawing the Communist Party. A search warrant was issued authorizing the seizure of "books, records, pamphlets, cards, receipts, lists, memoranda, pictures, recordings and other written instruments concerning the Communist Party of Texas." (*Stanford*, 379 U.S. at 486, 13 L. Ed. 2d at 437, 85 S. Ct. at 512.) The court stated:

> "[T]he constitutional requirement that warrants must particularly describe the 'things to be seized' is to be accorded the most scrupulous exactitude when the 'things' are books, and the basis for their seizure is the ideas which they contain." *Stanford*, 379 U.S. at 485, 13 L. Ed. 2d at 437, 85 S. Ct. at 511-12.

In *Allbritton*, the defendant was suspected of residential burglary. A warrant was obtained to search defendant's home for "jewelry, chains, cuff-links, sweater-closers and diamonds." (*Allbritton*,

150 Ill. App. 3d at 545.) The court noted that prior to seeking the warrant, the police discussed the burglary with the victim and a co-defendant. Both of these individuals had detailed knowledge of the items stolen, and a definite description of the items sought was neither impracticable nor impossible. The court held that detailed descriptions of the items sought were readily available and, therefore, the warrant was insufficient and properly quashed. *Allbritton*, 150 Ill. App. 3d at 547.

■ The case at bar does not involve first amendment rights, nor does it involve stolen merchandise. This case is similar to *Wolski* and *Mitchell* in that the officers were searching for evidence of the crimes committed. The officers did not know what the murder weapon was or even how the murder took place. The officers believed that the murder took place in the defendant's apartment. They also believed that evidence existed in defendant's apartment in the form of blood, fibers and weapons. We find that the warrant was sufficient due to the circumstances of this case. Therefore, we do not find error in the court's decision to deny defendant's motion to quash and suppress.

Defendant next contends that the trial court erred by admitting testimony of Delemeter concerning the incident in which defendant threatened him with a knife. The trial court granted defendant's motion *in limine* excluding this testimony. However, after defense counsel cross-examined Delemeter, the court stated:

"Initially I ruled that this was inadmissible on the case in chief or on direct. At this time, though, I think the defense has opened the door by going into several incidents not only at the house but otherwise about Mr. Rixie making statements about killing somebody, attacking them or something, and the defense has tried to show those were all in the context of jest and idle boasting in the presence of this witness. I think otherwise it would not be admissible. I think the defendant opened the door to show that."

Defendant contends that this evidence is wholly irrelevant and highly prejudicial, and the court erred by allowing it into evidence.

■ Evidence of criminal conduct other than that for which the defendant is on trial is generally inadmissible. (*People v. Romero* (1977), 66 Ill. 2d 325, 330.) However, the defendant cannot complain about the admission of testimony which is invited by defendant's own trial tactics. (*People v. Davis* (1977), 53 Ill. App. 3d 424, 432.) "If a defendant procures, invites or acquiesces in the admission of evidence, even though it be improper, he cannot complain." *People v.*

*Burage* (1961), 23 Ill. 2d 280, 283.

On cross-examination, the following exchanges took place:

"Q. You weren't afraid of Jamie that night; were you?

A. No.

\* \* \*

Q. When he said words to the effect that he's going to kill some MF, he laughed; didn't he?

A. Yeah.

\* \* \*

Q. You didn't take him serious [*sic*]; did you?

A. No.

Q. When Jamie gets drunk, normally doesn't he talk tough?

A. Yeah.

Q. When Jamie talks about somebody like he's going to fight somebody, doesn't he normally say things like, quote, I'll kill the mother fucker, something like that?

A. Yeah.

Q. Have you heard him say that in the past?

A. Yes.

Q. Have you taken him seriously in the past?

A. No.

\* \* \*

Q. When he made any type of a statement indicating he was going to kill somebody, isn't it true that he laughed, you laughed, and everybody there laughed and took it as a joke? True or not?

\* \* \*

Q. Did you laugh?

A. Yeah."

On redirect, the State asked Delemeter to describe the incident at the convenience store during which Rixie placed a knife to his throat and demanded repayment of a debt. Delemeter described the incident and indicated that he was afraid of Rixie at the time. This evidence was only introduced after the defendant had elicited testimony establishing that Delemeter was not afraid of Rixie and did not take him seriously. The testimony objected to was introduced after defendant had raised the issue and opened the door to this area of inquiry. Additionally, the court instructed the jury to only consider this evidence as it relates to the participants' states of mind and whether they were joking or serious. We find that the testimony was invited by the defendant. Therefore, it was not error to admit it into evidence. Furthermore, any prejudice that resulted was cured by the

limiting instruction given by the court.

Defendant's next contention is that the trial court erred by allowing the State to nol-pros the murder charge. After an instruction conference during which the court expressed its decision to give instructions on several lesser-included offenses, the State moved to nol-pros the murder charge and proceed only on felony murder. The court granted this motion. Defendant claims that he was substantially prejudiced because the jury was precluded from finding him guilty of a lesser-included offense and was forced to find him guilty or not guilty solely of felony murder. We disagree.

■ The State's Attorney has nearly unfettered discretion in determining whether to nol-pros a charge. (*People v. Olson* (1984), 128 Ill. App. 3d 560, 562; *People v. Verstat* (1983), 112 Ill. App. 3d 90, 102.) The State's Attorney has absolute power to nol-pros a charge unless his actions are vexatious or repetitious or will cause substantial prejudice to the defendant. (See *Olson*, 128 Ill. App. 3d at 562.) This power extends throughout all stages of the trial proceedings. *Olson*, 128 Ill. App. 3d at 562.

■ Defendant argues that he presented a defense based upon the many verdict options that would be available to the jury if the defense was well formulated. By allowing the State to nol-pros count I of the indictment, the jury was limited to finding guilty or not guilty of felony murder only. We do not see this as substantially prejudicing defendant. Defendant knew of the felony murder charge since the inception of the proceedings. He was given a full opportunity to prepare and present a defense to felony murder. The jury was presented with all the evidence in this matter along with counsel's arguments that Rixie was not involved in any plan or attempt to rob Misslich. The jury could have concluded that Rixie may have been guilty of something, but not felony murder. This determination would have required the jury to find Rixie not guilty. The jury was properly instructed on the remaining charge of felony murder and, after considering all the evidence, the jury returned a verdict of guilty. Simply because the defendant may have been guilty of a lesser offense to murder, had it been charged, does not require a finding of prejudice because he was not so charged. The court did not err in allowing the State to nol-pros the murder charge and to proceed on only the felony murder charge.

■ Defendant next contends that his due process rights were violated because the State's Attorney's office informed the Rockford police to refrain from speaking with defendant's counsel.

This issue was not addressed in defendant's post-trial motion.

This argument is therefore waived. (See *People v. Precup* (1978), 73 Ill. 2d 7, 16.) Even if not waived, defendant's claim lacks merit. Defendant has not established that his attempts to interview Rockford police officers were thwarted. Defendant has set forth no evidence whatsoever that this conduct, assuming it did in fact occur, prejudiced his preparation and presentment of a defense.

▪ Defendant's last contention is that the trial court's imposition of a 60-year sentence was excessive and, therefore, error. The imposition of a criminal sentence is a matter of judicial discretion, and the sentence may not be altered upon review unless there is an abuse of discretion. (*People v. Perruquet* (1977), 68 Ill. 2d 149, 153.) The trial court's decision with respect to sentencing is entitled to great weight and deference. (*Perruquet*, 68 Ill. 2d at 154.) Additionally, when considering an extended-term sentence, the court's focus is on the offense committed rather than the nature of the offender's participation. *People v. Johnson* (1985), 132 Ill. App. 3d 1, 7.

The court noted the defendant's potential for rehabilitation, but also stressed the offense committed and the surrounding circumstances. The court discussed the fact that the victim was lured to defendant's apartment, bound and gagged, and then stabbed between 40 and 50 times. The robbery proceeds totaled $12. The victim's body was then taken and dumped in a park. The court indicated, and we agree, that this was a brutal and heinous offense. The court indicated that a term of less than 60 years would deprecate the seriousness of the offense.

A reviewing court will not substitute its judgment for that of the trial court merely because it would have balanced the appropriate sentencing factors differently. (*People v. Cox* (1980), 82 Ill. 2d 268, 280.) We find that the court took into consideration all of the appropriate factors and did not abuse its discretion in imposing an extended sentence of 60 years.

The judgment of the circuit court of Winnebago County is affirmed.

Affirmed.

INGLIS and REINHARD, JJ., concur.