THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. MARCUS T. GRENGLER, Defendant-Appellant.

Second District No. 2—91—0829

Opinion filed July 23, 1993.

---

G. Joseph Weller and Ingrid L. Moller, both of State Appellate Defender's Office, of Elgin, for appellant.

James E. Ryan, State's Attorney, of Wheaton, and Jerome T. Genova, of Calumet City (William L. Browers and Marshall M. Stevens, both of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE DOYLE delivered the opinion of the court:

Following a jury trial in the circuit court of Du Page County, defendant, Marcus Grengler, was found guilty of robbery (Ill. Rev. Stat. 1991, ch. 38, par. 18—1 (now 720 ILCS 5/18—1 (West 1992))) and theft (Ill. Rev. Stat. 1991, ch. 38, par. 16—1(a)(1)(A) (now 720 ILCS 5/16—1(a)(1)(A) (West 1992))). Defendant was sentenced to six years' imprisonment on the robbery conviction. Defendant filed a timely appeal of his conviction and sentence, raising the following issues: (1) whether sufficient evidence was presented to prove defendant guilty of robbery beyond a reasonable doubt; (2) whether the trial court erred by permitting the State to use his prior theft conviction as impeachment evidence; and (3) whether, if defendant's robbery conviction is reversed, the trial court must reconsider defendant's petition for TASC treatment when he is resentenced for his theft conviction.

According to defendant's testimony, between 6 and 7 p.m. on February 23, 1991, defendant met some friends at a bar in Elgin. He consumed a couple of beers and then proceeded to a second bar where he drank more beer and one or more shots of tequila. Sometime around 8:30 or 9 p.m., defendant went to a third bar where he drank a few more beers and five to six more "shooters." Defendant also smoked

some marijuana. Around 10 or 11 p.m., defendant left the bar and attempted to drive home. On the way, he stopped at a convenience store, bought a 12-pack of beer, and obtained directions to Aurora. As he drove, defendant consumed six or seven of the beers. Believing he was lost, defendant stopped again and telephoned his boss for directions. Defendant continued to drive around, and, at about 1 a.m., he pulled into a gas station. Defendant parked his car and entered the station.

Don Shoup testified that he was the only employee scheduled to work at the gas station from 11 p.m. on February 23, 1991, until 7 a.m. the next morning. Shoup testified that defendant came into the station at around 1 a.m. and asked him for directions to Aurora. Shoup had been preparing a deposit, and, when defendant came into the station, Shoup put the deposit money under the counter. Shoup responded that he did not know the way to Aurora and told defendant to look at a map. Defendant took a map from a rack and the two began looking at it. During this time an unknown man entered the station, said he was lost, and asked to use a telephone. Shoup directed him to a pay phone outside the station. Two women also came into the station.

Shoup testified that after the women left, defendant asked "if I had ever seen a .25." Shoup responded, "no," thinking defendant meant highway 25 or Route 25. Defendant again asked if he had seen a .25, and Shoup responded, "[W]hat are you talking about?" Defendant replied, "a .25 special." At that point, defendant put his right hand in his coat pocket and pushed up against his pocket with something and said either "[G]ive me it," or "Give it to me." Shoup stated that he saw something round which looked like the end of a gun pushed up inside defendant's coat pocket. Shoup testified that he thought defendant had a gun, so he stepped back, opened the cash register, and gave defendant approximately $150 in $1, $5, and $10 bills. He did not give defendant the deposit money from under the counter. Defendant took the money, put it in his pocket, and told Shoup to give him a minute before calling anyone. As defendant left the station, Shoup recorded his license plate number and called the police immediately after defendant drove away. Shoup testified that the entire encounter lasted about 20 minutes.

Defendant offered a markedly different version of events. He testified that he asked Shoup where Aurora was and how to get there. Shoup said that he did not know and offered to show defendant a map. Shoup got a map, spread it out on the counter, and they started looking for Aurora. While they were looking at the map, another man

came in asking for directions, and Shoup directed him to a 7-Eleven store across the street. Defendant did not remember anyone else entering the store.

Defendant testified that he and Shoup talked and watched television while looking at the map. Defendant also stated that he smoked one or two cigarettes during this time. Defendant testified, "[W]hen we were looking at the map and he mentioned something about, you know, you have got to be real careful because now, this is a good time to get robbed late at night and I said yeah and we were trying to figure out where the 25 was and what main roads were going through it and I asked him to look for Route 31 or 25." Defendant stated further, "[W]hile we were standing around and trying to find this and he is looking all over and finally we found Aurora on the map and I said now where is 25 and when I said that, he said what did you say? You know where 25 is and he looked at me and he said what? You know where 25 is. Find 25. And he then, when I said that, he goes what do you mean, and I said what do you mean what do I mean. I am looking for Route 25 and then he started getting—he was backing up from the counter." Defendant said that at this time he was pointing at the map, and, although he did not remember where his hands were, he admitted that they might have been in his pocket.

Defendant testified that after backing up, Shoup told him "hey it is okay, it is cool" and then went over to the cash register, took out the money, walked up and handed over the money, and told him to take it. Defendant testified, "I told him what do you mean. You know, what is going on." Shoup backed away from the counter, and defendant told him, "Don't call the cops. We can straighten this out, man." Defendant stated that he tried to return the money, but Shoup would not take it. Shoup responded "no, no, no, no. Don't worry. I am not calling anybody. Everything is cool, man." Defendant testified that he "figured sooner or later someone was going to walk in and they were going to nail me and the cops were going to show up and I was going to be in royal trouble and I got out and I got in my car and started driving away." Defendant admitted that he took the money with him when he left, rather than leaving it on the counter.

Defendant drove for about 5 to 10 minutes and then pulled into an industrial park where he sat and drank another beer. He stated that he saw several squad cars go by so he drove back on the road where he was subsequently stopped and apprehended by police. When defendant was arrested $146 was found in the left, front pocket of his coat, and a container of lip balm was found in the right, front pocket. The money consisted of $1, $5, and $10 bills.

Thomas Bialas, police officer for the Village of Glendale Heights, testified concerning a conversation he had with defendant while defendant was seated in a squad car:

"According to [defendant], he indicated to me that he was lost and driving around when he decided to pull into the [gas station] *** to try and get directions. According to [defendant], when he went into the gas station, he was obtaining instructions from the attendant on how to get to Route 25. [Defendant] indicated that a male black had entered the gas station. After *** [defendant] had obtained his directions, [defendant] walked out and got into his car. [Defendant] then said that the male black gentleman walked out of the gas station and walked over to [defendant's] car and got in the passenger side and had a conversation with the male black; at which time, according to [defendant], the male black told him to take the money and that they would meet at the intersection of, at the 7-11 at Armitage and Glen Ellyn Roads in Glendale Heights and according to [defendant] he indicated that he was going, he decided to go ahead and take the money and then he drove off towards looking for Armitage and Glen Ellyn."

Bialas also testified about a statement defendant made at the police station.

"[Defendant] indicated that while he was talking to the attendant he had stretched a map out on the counter. While they were looking at the map awhile, a male black did enter the store. However, at this conversation, [defendant] *** indicated to me *** the male black entered the store and left while [defendant] was still in the store ***. The male black gentleman bought something from the clerk and then exited the store. After the male black left the store [, defendant] said that the clerk made a statement to [him] regarding having to be careful about being robbed. *** According to [defendant], the conversation then turned to the gas station attendant, Mr. Shoup, starting to talk to [defendant] about taking the receipts from the register and according to [defendant] he agreed to take, I believe *** he said $186.00. He took $186.00 from the attendant and put it in his pocket and he left with an agreement with the gas station attendant, Mr. Shoup, that Mr. Shoup would come to the 7-11 at Armitage and Glen Ellyn Road and give [defendant] $50.00 of the money and [defendant] would then turn the rest of that money over to Mr. Shoup."

Defendant denied telling police that a black guy had jumped in the car, given him the money, and told him to meet at the 7-Eleven. Defendant denied telling police that Shoup had agreed to pay defendant $50 to help him fake a theft, but admitted telling them that he thought Shoup could have been ripping off the till and might have given him the money to cover it up.

Defendant moved, *in limine*, that the State be precluded from introducing certified copies of defendant's prior convictions of misdemeanor and felony theft. In particular, defendant asserted that because the charges being tried also included a theft, the risk of unfair prejudice exceeded the convictions' probative value. Alternatively, defendant requested that the State be permitted to use only the felony conviction and that it be labeled as "a prior conviction" without reference to the fact it was a theft. The State sought to introduce both convictions, arguing that defendant's credibility would be at issue in the case and that any prejudicial effect could be cured by a limiting instruction. The State objected to labeling the theft as "a prior conviction" and argued that it pertained to credibility because theft is a crime of dishonesty. The trial court denied defendant's motion, allowing the State to use defendant's June 9, 1982, felony theft conviction for impeachment purposes. The trial court ruled that the prior offense would be referred to as theft without reference to the fact that it was a felony. The trial court also gave the following instruction to the jury regarding the conviction:

> "Evidence of the defendant's previous conviction of an offense may be considered by you only as it may affect his believability as a witness and must not be considered by you as evidence of his guilt of the offense with which he is charged." See Illinois Pattern Jury Instructions, Criminal, No. 3.13 (2d ed. 1981) (hereinafter IPI Criminal 2d No. 3.13).

The presentence report prepared in connection with this case reveals that between defendant's June 9, 1982, conviction and the trial, defendant was incarcerated on various occasions, including two extended periods in the California State Prison system. On June 21, 1982, defendant was sentenced to a term and released in 1987. On December 11, 1987, defendant was again sentenced and released in March 1989.

Defendant initially contends that the State failed to present sufficient evidence to prove him guilty of robbery. Specifically, he asserts that the evidence failed to prove that he threatened the imminent use of force. It is well established that the standard for reviewing the sufficiency of evidence supporting a criminal conviction is whether, after

considering all of the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. (*People v. Smith* (1992), 149 Ill. 2d 558, 565; *People v. Hendricks* (1990), 137 Ill. 2d 31, 62.) The reviewing court must consider that the jury heard and saw the witnesses and was, therefore, in the best position to assess their credibility, determine the weight to be accorded their testimony, decide what inferences to draw from the evidence, and resolve any factual disputes arising from conflicting or inconsistent testimony. (*Hendricks*, 137 Ill. 2d at 65; *People v. Reid* (1990), 136 Ill. 2d 27, 61; *People v. Eyler* (1989), 133 Ill. 2d 173, 191.) A reviewing court must not substitute its judgment for that of the trier of fact on those issues, particularly as to the weight of disputed evidence (*People v. Herrett* (1990), 137 Ill. 2d 195, 206), unless the evidence presented at trial is so unsatisfactory, unreasonable or improbable that no rational trier of fact could have found the defendant guilty beyond a reasonable doubt. (*Reid*, 136 Ill. 2d at 61; see also *People v. Pasch* (1992), 152 Ill. 2d 133, 187.) A jury is "not required to accept any possible explanation compatible with the defendant's innocence and elevate it to the status of reasonable doubt." *Herrett*, 137 Ill. 2d at 206.

The use of force or the threat of the imminent use of force is an essential element of the crime of robbery. (Ill. Rev. Stat. 1991, ch. 38, par. 18−1 (now 720 ILCS 5/18−1 (West 1992)); *People v. Williams* (1976), 42 Ill. App. 3d 134, 138.) Defendant acknowledges that a person may be convicted of robbery if the evidence demonstrates that he or she took some action indicative of being armed in combination with words spoken to the victim, such as a threat of harm or an announcement of the robbery, even though the perpetrator was not actually in possession of a weapon. (See *People v. Hollingsworth* (1983), 120 Ill. App. 3d 177, 179.) Merely instructing a victim to hand over money or property, in the absence of any action which would reasonably induce the victim to believe that the perpetrator was armed or otherwise threatening force, does not amount to a robbery. (See *Hollingsworth*, 120 Ill. App. 3d at 179.) Proof of a threat of the imminent use of force is established by evidence that the fear of the victim was of such a nature as in reason and common experience is likely to induce a person to part with his or her property for the sake of his or her person. (*Hollingsworth*, 120 Ill. App. 3d at 178-79; *People v. Dates* (1981), 100 Ill. App. 3d 365, 371.) However, a victim's subjective feeling of fear will not support a robbery conviction in the absence of facts to show that that fear was reasonable. *Hollingsworth*, 120 Ill. App. 3d at 179.

.

■ Shoup testified that defendant asked him if he had ever seen a .25 special. Defendant then put his hand in his coat pocket and pressed something up against it that looked like the barrel of a gun. Shoup said he believed defendant was threatening him with a gun. Defendant's reference to "a .25 special" distinguishes this occurrence from a case in which there were no acts or statements by a defendant, other than having a hand in a pocket, which support the inference that the defendant was armed. (See *Williams*, 42 Ill. App. 3d at 138.) Defendant also said "[G]ive me it," or "Give it to me." It can be reasonably inferred that this comment, when viewed in conjunction with defendant's previous comments and contemporaneous actions, was both an announcement of the robbery and a threat of force to Shoup. (See, *e.g., People v. Bradford* (1979), 78 Ill. App. 3d 869, 874 (placing hand in camera bag in conjunction with a demand for money constituted a threatening of imminent use of force).) Although this sequence of events was disputed by defendant, what actually happened on the morning of February 24 was a matter for the jury to resolve. Reviewing Shoup's testimony and the reasonable inferences that can be drawn therefrom, in the light most favorable to the State, we conclude that the evidence presented was sufficient to support defendant's robbery conviction.

■ Because we affirm defendant's robbery conviction, the third issue raised by defendant, concerning the applicability of the factors the trial court considered in denying defendant's petition for TASC treatment with respect to resentencing on the theft conviction, is rendered moot and need not be addressed. See *Dixon v. Chicago & North Western Transportation Co.* (1992), 151 Ill. 2d 108, 116.

The remaining issue is whether the trial court erred in permitting the State to introduce a certified copy of one of defendant's prior theft convictions as impeachment evidence. Defendant contends that the probative value of that conviction was substantially outweighed by the danger of unfair prejudice. The State responds that the trial court acted properly and within the scope of its discretion by strictly limiting the use of the prior conviction and providing the jury with an instruction limiting its evidentiary use.

Although a prior criminal conviction is not admissible to show a defendant's propensity to commit crime, if the prior conviction is for a felony or other crime involving dishonesty, then the trial court, in its discretion, may allow the conviction to be used to impeach the defendant if the trial court determines that the conviction's probative value outweighs the danger of unfair prejudice. (*People v. Lawler* (1991), 142 Ill. 2d 548, 563; *People v. Montgomery* (1971), 47 Ill. 2d

510, 516; *People v. Rixie* (1989), 190 Ill. App. 3d 818, 826.) The trial court is to be given wide latitude in exercising this discretion. (*Rixie*, 190 Ill. App. 3d at 826.) The factors which are normally considered by the circuit court in exercising its discretion include the nature of the crime, nearness or remoteness of the crime, the subsequent career of the person, and whether the crime was similar to the one charged. (*People v. Redd* (1990), 135 Ill. 2d 252, 325; *Rixie*, 190 Ill. App. 3d at 826.) Evidence of a conviction used to impeach a witness is inadmissible if a period of more than 10 years has elapsed since the date of conviction or release of the witness from confinement, whichever is later. *Lawler*, 142 Ill. 2d at 563.

■■ Theft has been specifically recognized as a crime of dishonesty. (*People v. Spates* (1979), 77 Ill. 2d 193, 201-04; *People v. Whitelow* (1991), 215 Ill. App. 3d 1, 7.) Thus, it was within the trial court's discretion to allow defendant's prior conviction to be used for impeachment purposes. Although the conviction was approximately nine years old, the record indicates that defendant was incarcerated during the majority of that time, and he was released from the California State Prison system less than two years before committing the present offense. The recency between release and arrest reflects negatively on defendant's likelihood of being rehabilitated and, thus, impacts on his credibility. (*People v. Wright* (1991), 218 Ill. App. 3d 764, 774.) It would, therefore, be inaccurate to characterize defendant's felony conviction as "remote."

Defendant specifically complains that he was unfairly prejudiced because he was on trial for a theft charge and a prior theft conviction was used to impeach him. Where a prior conviction involves a crime which is probative concerning defendant's veracity and honesty as a witness, and the evidence was admitted solely for that reason, it is not mandatory that a conviction of the same type of crime that is charged in the case for which the defendant is being prosecuted necessarily be excluded. See *Whitelow*, 215 Ill. App. 3d at 7; *Rixie*, 190 Ill. App. 3d at 826.

Defendant asserts, "the record does not indicate that the judge weighed the probative value of the use of the conviction against the prejudicial impact." We note that the trial court in its ruling made specific reference to the *Montgomery* decision and the required balancing test. Because the trial court was aware of *Montgomery* and its provisions, it must be assumed that the judge gave consideration to the relevant factors, and the reasons for the trial court's ruling need not appear in the record. (See *Wright*, 218 Ill. App. 3d at 774; *People v. Marron* (1986), 145 Ill. App. 3d 975, 983-84.) Further, contrary to

defendant's assertion, the record provides ample support for the conclusion that the trial judge weighed the probative value of the proffered impeachment evidence against the danger of unfair prejudice to defendant. First, the State submitted two certified convictions of theft, one a misdemeanor and the other a felony. The trial court allowed the State to introduce only the felony theft conviction and specifically prohibited the use of the term "felony" in reference to this conviction. The trial court also gave the appropriate limiting instruction (IPI Criminal 2d No. 3.13) to the jury which explained the sole purpose for which they could use the evidence of the prior conviction. These rulings demonstrate that the trial court considered and balanced the probative value and potential prejudicial effect of the impeachment evidence. Based upon the record presented, we find that the trial court did not abuse its discretion in permitting the State to introduce defendant's prior felony theft conviction as impeachment evidence.

For the foregoing reasons, the judgment of the circuit court of Du Page County is affirmed.

Affirmed.

INGLIS, P.J., and COLWELL, J., concur.