THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. JOHN LEWIS KUNZE, Defendant-Appellant.

Fourth District   No. 4—89—0080

Opinion filed February 15, 1990.—Rehearing denied February 28, 1990.

STEIGMANN, J., specially concurring.

Daniel D. Yuhas and Gloria A. Carroll, both of State Appellate Defender's Office, of Springfield, for appellant.

John Robinson, State's Attorney, of Sullivan (Kenneth R. Boyle, Robert J. Biderman, and James Majors, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE SPITZ delivered the opinion of the court:

Kunze, along with two codefendants, Phillip Finklea and Richard DiBartolomeo, was found guilty of residential burglary after a jury trial. He appeals, arguing (1) the State did not establish his guilt beyond a reasonable doubt, (2) the State violated a discovery order by failing to provide him with certified copies of his prior convictions which were subsequently used to impeach him, (3) his counsel failed to adequately investigate his criminal record, (4) his counsel incompetently advised him to testify, and (5) in imposing sentence, the trial judge improperly relied upon the mistaken belief that Kunze qualified for an extended-term sentence.

## I. THE EVIDENCE

Kunze was charged with residential burglary of the home of Barbara and Gerald Reedy, located in a rural area of Moultrie County

near Lovington. The Reedys discovered the burglary when they returned home from church on the morning of September 25, 1988. Barbara Reedy testified that on that date, the family left for church about 9:15 or 9:20 a.m. Both the front and back doors of their home were locked when they left for church. When the family returned home at approximately 10:45 or 10:50 a.m., Mrs. Reedy observed that the back door was unlocked and the front door was open. Mrs. Reedy further observed that several items on her dresser, particularly a jewelry box, had been moved. Nothing, however, was missing from the jewelry box. Subsequently, on September 28, 1988, Mrs. Reedy discovered that a screen in a utility room of the family's residence had been pushed out of its track. She stated that the family kept duplicate sets of keys to their home on a ledge beneath the window which had contained the displaced screen.

Gerald Reedy corroborated his wife's testimony as to the time of day his family left for and returned from church. After Mrs. Reedy informed him that the jewelry box on her dresser had been moved, he checked a file cabinet in which he kept some money in a brown envelope. Mr. Reedy discovered that both the brown envelope and the money were missing. According to Mr. Reedy's testimony, the envelope had contained approximately $388 to $408. Included among the currency in the envelope was one $100 bill and two $50 bills. Upon discovering the missing money, Mr. Reedy called the sheriff.

Shortly thereafter, Mr. Reedy heard a "motor noise." He went outside and discovered a car sticking out of his 60-acre cornfield, which was subsequently identified as a vehicle belonging to defendant Finklea. The vehicle was located west of the Reedy farmhouse on the same side of the road as the farmhouse. Upon approaching the car, Mr. Reedy saw an individual dodge into the cornfield when the individual saw Mr. Reedy. Reedy then took the coil wire off of the car's motor in order to render it inoperable.

Mr. Reedy further testified that he informed a deputy sheriff of the events which had previously transpired and then drove south on the road which fronts the west side of the tract of land containing his 60-acre cornfield. While doing this, he met Willis Bolsen, a neighboring farmer who lives on the same side of the road as the Reedy family. After he came upon Mr. Bolsen, Mr. Reedy saw two heads bob up in the cornfield.

Upon returning to his residence and making a further inspection thereof at the request of the deputy sheriff, Mr. Reedy discovered that one of three sets of keys to the house, which were usually on the shelf in the utility room, was missing. Mr. Reedy testified that this set

of keys was never recovered. Mr. Reedy further testified that the corn in the 60-acre cornfield was harvested on September 26 and 27, and that on September 28, he discovered a $5 bill in the soil at the southwest corner of that field. He placed a small red flag by the $5 bill and reported his discovery to the sheriff's department.

Willis Bolsen testified that on the morning of September 25, 1988, an automobile, which was subsequently identified as Finklea's car, slowed down in front of his house while he was filling grain bins. Bolsen noticed one of the occupants looking at him for quite a while. Bolsen stated that he thought this occurred about 10 or 10:15 a.m., but he could not be sure because he was not wearing a watch and he was very busy working at the time. Later that same morning, after Reedy had told Bolsen the details of the burglary of Reedy's home, Bolsen spotted two individuals in Reedy's 60-acre cornfield. Bolsen unsuccessfully attempted to persuade them to come out of the field.

Deputy Jeff Thomas described the circumstances of the arrest of Kunze and his two codefendants. Upon arriving at the Reedy farm in response to Reedy's call, Thomas requested the assistance of other law enforcement officers. Eventually the 60-acre Reedy cornfield was surrounded by several law enforcement officers, but Kunze and his two companions did not come out of the field. Consequently, Thomas summoned a State police airplane, and the three defendants were spotted by the airplane lying down between the corn rows in the northwestern part of the field. Thomas and two other law enforcement officers were directed by messages from the plane to search that area of the field, where they eventually arrested the defendants.

Thomas testified that a 100-foot path of knocked-down corn ran south from the point where Finklea's vehicle was discovered. The stalks were lying in a northerly direction. The area of knocked-down corn extended to the east to where the Finklea vehicle apparently entered the field. The point of entry was adjacent to a field road which ran south from the public road on which the Reedy farm was located, adjacent to an oat field.

In the area of knocked-down corn which ran to the east, the corn stalks were at varied angles, as if they had been "driven over in a couple of different directions." East of the area of the knocked-down corn which ran north and south, there were about four rows of standing corn, four rows of harvested corn, and the field road. Thomas and the other law enforcement officers on the scene discovered a path consisting of indefinite footprints extending from the area of knocked-down corn through the freshly planted oat field to a shop building on the curtilage of the Reedy residence. The footprints could not be fol-

lowed beyond the shop building.

Thomas further testified that on the date of the arrest of Kunze and his codefendants, a search of the Reedy farm for the missing set of keys and the missing envelope which contained the Reedys' cash proved fruitless. However, when Kunze was being booked, Thomas discovered $214 in cash in his wallet, consisting of one $100 bill, two $50 bills, and several smaller bills. Kunze told Thomas that he was given the money on the preceding Friday by his sister to make a house payment.

Thomas also testified about a statement which Finklea made while in custody on September 25, 1988. Finklea told Thomas that he, Di-Bartolomeo, and Kunze went to the Reedy residence "for revenge," specifically to get back at Gerald Reedy for pressing charges against his son, Chris Reedy, as a result of a burglary at Gerald Reedy's farm.

Finklea also told Thomas that, as they drove through the Reedy cornfield, the radiator of his car came loose. Because of this, he got out of his vehicle and walked to the road. Kunze then "drove the vehicle through the corn which caused it to get stuck in the ditch." As they were attempting to extricate Finklea's vehicle from the ditch, they noticed a farmer coming, got scared, ran into the cornfield, and hid.

Thomas testified that he was called back to the Reedy farm on September 28, 1988. At that time, Mrs. Reedy directed Thomas to an old bean field at the southwest corner of the 60-acre Reedy cornfield. There he observed a $20 bill which had been marked by a red flag. Eventually $190, consisting of two $50 bills, four $20 bills, and one $10 bill, was recovered from the field.

As a final matter, Thomas testified that he was called to the Reedy residence a second time on September 28. At that time, he observed a screen on the east side of the residence "which had been forced and damaged a little bit."

Also testifying for the State was Gerald Heavey, a forensic scientist specializing in latent fingerprint identification. Heavey conducted tests for latent fingerprints on the money contained in Kunze's wallet at the time of his arrest and on the money recovered from the Reedy cornfield. No suitable latent prints were developed on any of that currency.

Tommy Martin, a forensic scientist with the Illinois State Police, testified on behalf of the State that he examined the Reedy residence for indications of a break-in on September 25, 1988. He observed some very superficial pry marks on the front door which he believed were not characteristic of those found in connection with a forced en-

try. He processed the front door, the back door, two jewelry boxes located in the master bedroom, the file cabinet which had contained the missing money, and some envelopes in the file cabinet for latent fingerprints. No identifiable prints were discovered on any of these objects. Martin then inspected the exterior of the residence from a distance of 10 to 20 feet for things such as broken windows, open windows, and footprints, but found nothing. He also examined the Reedy cornfield and observed unidentifiable footprints leading from the area of damaged corn to the curtilage of the Reedy residence. Finally, Martin utilized an electrostatic dust print lifter to examine the kitchen floor and back porch floor for footwear imprints, but found none.

At the conclusion of the State's case, the court denied the defendants' motion for a directed verdict.

Janice Sterling, defendant Kunze's sister, testified that on Saturday, September 27, 1988, she gave Kunze $203 in cash to make the house payment at a realty office. This money consisted of one $100 bill, two $50 bills, and three $1 bills. Sterling further testified that at 9:35 a.m. on September 25, Kunze dropped her off at the Econo Lodge, where she worked.

Defendant Kunze's brother, Richard Kunze, testified that at about 5 p.m. or 5:30 p.m. on September 24, he gave defendant Kunze $20 which he owed him. At that time, defendant Kunze had an additional $203 in the form of a $100 bill, two $50 bills, and three $1 bills. Defendant Kunze's possession of the $203 on September 24 was also corroborated by Evelyn Breazeale, his sister; Rae Kunze, his mother; Marie Mahoney, defendant Kunze's niece and Finklea's fiancee; and Tina Burris, defendant's roommate. Rae Kunze stated that she had never before seen defendant Kunze with such a large sum of money.

Tina Burris testified that she last saw Kunze outside of his residence at 1829 East Prairie, in Decatur, at 10:30 a.m., on September 25. At that time, he went for a drive with two other individuals. Marie Mahoney also testified that on September 25, Kunze left his residence at approximately 10:30 a.m. in the company of Finklea and DiBartolomeo. The three individuals headed west.

Defendant Kunze, testifying on his own behalf, stated that on the morning of September 24, Janice Sterling gave him $203 in the form of one $100 bill, two $50 bills, and three $1 bills. Sterling told Kunze to use the money to make a house payment at Campbell's Realtors. He attempted to make the payment later that morning, but could not find a parking space at the real estate office. When he again attempted to make the payment that afternoon, "[T]he guy said they

would not take the money because the lady was not there to receive the money. There was a lady that did the paper work." Kunze testified that later that day he showed the money to several people so he wouldn't get into trouble and in order to prove that he had not made the house payment.

Defendant Kunze further stated that he left his residence at about 10:30 a.m. on September 25 in Finklea's car, in the company of Finklea and DiBartolomeo. They stopped at a gas station and then went "joy riding." They ended up in the Reedy cornfield. Kunze stated he did not go into the Reedy house or any of the buildings on the Reedy premises or take any money from the Reedy residence. While he was on the Reedy property, Finklea and DiBartolomeo were never out of his sight.

Kunze testified on cross-examination that after leaving Decatur, he stated, "Let's run a corn field down," and that Finklea suggested that they run down the Reedy cornfield in order to get revenge on Mr. Reedy for bringing about the incarceration of his son, Chris. Kunze testified that they entered the Reedy cornfield via a field road west of the Reedy residence. The vehicle in which they were riding pulled into the field going forward, then backed up and turned north. The vehicle then experienced radiator trouble. Finklea exited the car and walked immediately in front of it, while Kunze drove the car. Kunze thought that the car would make it onto the road on which the Reedy home was located, but "it got hung up in the ditch." Kunze stated that shortly thereafter, they saw Mr. Reedy come running out to the roadway. Kunze turned the car off and crawled into the cornfield. Kunze further stated that en route to the Reedy farm, he remembered driving by a farmhouse and staring at a farmer.

On redirect examination, Kunze acknowledged two prior convictions of criminal offenses.

The defendants then presented the testimony of Larry Chapman, a real estate broker with Campbell and Sons in Decatur. He testified that on Saturdays, the escrow department, which handles house payments, is open from 8:30 a.m. until noon. Although personnel are in the office on Saturday afternoons, cash escrow payments are not accepted at that time. Chapman recalled that while he was in the office on a Saturday afternoon during the preceding August or September, a young man came in wanting to make a cash payment, which was not accepted. On cross-examination, Chapman stated that the person who attempted to make the cash escrow payment was a young, white male, but Chapman did not get a good enough look at him to be able to identify him at trial.

Defendant DiBartolomeo testified that he and his two codefendants arrived at the Reedy farm at 11:10 a.m. on September 25. He recalled the time because he heard it announced on the radio as they arrived at the farm. His testimony in general corroborated that of Kunze concerning events in the Reedy cornfield. He denied entering the Reedy house or taking money from it, and stated Finklea and Kunze were in his sight the entire time they were in the Reedy cornfield.

On cross-examination, DiBartolomeo acknowledged that with the radiator falling out of the car, it would have been easier and safer to leave the cornfield by a different route. He admitted that driving through the area where the corn was already run down and over the farm lane or access road would have been better than driving across a ditch.

On re-cross-examination, DiBartolomeo denied that on September 25, he and his two codefendants were in the southwest area of the Reedy cornfield where the cash was subsequently discovered on September 28.

Defendant Finklea also testified on his own behalf. He stated that on the morning of September 25 (before he and his two codefendants arrived at the Reedy property), he saw defendant Kunze in possession of one $100 bill and one $50 bill. He stated that on September 25, he, Kunze, and DiBartolomeo left Decatur between 10 and 10:30 a.m. Finklea provided the following description of the manner in which the three defendants decided to go to the Reedy farm:

> "We was [sic] out on 36 out around Mt. Zion and I recall John [Kunze] requested to go—I mean he suggested going through a corn field. I told him, you know, I don't want to go through a corn field with my car unless it was Mr. Reedy's. I put that remark in. Because I said if I am going to mess up my car up going through a corn field, you know, I am going to do it to someone I don't like."

Finklea generally corroborated the testimony of Kunze and DiBartolomeo concerning events after they arrived at the Reedy farm. He stated that the defendants were clearly visible to each other throughout the incident at the farm and denied that any of them entered the Reedy residence on that date.

On cross-examination, Finklea acknowledged that he did not like Mr. Reedy because of what happened to his son, Chris, and was therefore willing to drive into Mr. Reedy's cornfield and risk damage to his automobile. The following exchange occurred between Finklea and the State's Attorney concerning the manner in which Kunze attempted to

exit the cornfield while driving Finklea's vehicle:

"Q. You were concerned that it [the radiator in Finklea's car] was going to fall out. Wouldn't it have been a lot easier instead of going through—now as you drove out, you are driving through corn that's standing up, aren't you?

A. Yeah.

Q. And you are knocking it down, right?

A. Yeah.

Q. It would have been a lot easier on your radiator to come back either to [the field] road or the [harvested] corn, wouldn't it, and driven [*sic*] out there would have caused a lot less damage to your radiator, wouldn't it?

A. Most possibly, it could and then possibly it could not because the radiator trouble I was having was at the bottom where the radiator sets. That was wired up.

Q. That's true. But as you go over corn stalks, you have now more stuff going under your car to grab hold of your radiator and pull it out and pull it loose, don't you, than if you had just pulled back out here where it had already been picked?

A. Not necessarily because the stuff was flying over the car.

Q. Flying over; how fast were you driving?

A. Five miles an hour.

Q. You got out to the edge right here and you were the guide right at this point?

A. Yeah. I was walking in front of it if that's what you mean.

Q. Why were you walking in front of him?

A. Because I didn't want my radiator to fall out. I was watching it.

Q. So you are out in front, you come up to this ditch and you see there is a nice ditch there, don't you, right?

A. Yeah."

Finklea testified on cross-examination that he honestly could not say whether he was in the southwest area of the Reedy cornfield, where the money was recovered, but stated, "we was [*sic*] all over the corn field running." Finklea further stated that except for the arresting officers, no one other than he and his two codefendants was in the cornfield. He did not recall seeing anyone around the Bolsen residence when they passed it en route to the Reedy cornfield. Finklea implied that he did not leave the cornfield voluntarily because he thought that only hostile civilians surrounded the field and he did not know that law enforcement officers were present.

The State and the defendants stipulated that Christopher Reedy, who is a son of Gerald Reedy, pleaded guilty to a charge of unlawful possession of a stolen or converted vehicle belonging to Gerald Reedy. The charge arose from Christopher taking a vehicle belonging to Mr. Reedy from Mr. Reedy's shed on September 12, 1988.

At the conclusion of the evidence, the State introduced for impeachment purposes evidence of Kunze's three prior convictions. These consisted of two burglary convictions and one conviction of criminal damage to property in excess of $300 in value. All of these offenses were committed in 1986.

Following a sentencing hearing, the court sentenced Kunze to 10 years' imprisonment.

## II. THE SUFFICIENCY OF THE EVIDENCE

Kunze contends he was not proved guilty beyond a reasonable doubt of burglarizing the Reedy residence. He acknowledges that the evidence establishes that the Reedy residence was burglarized, but states the evidence does not establish that the defendants committed that burglary. He asserts that according to the evidence, the burglar or burglars must have been familiar with the Reedy residence, but observes that Mrs. Reedy testified that none of the defendants had ever been in the Reedy residence before the burglary. He asserts, "therefore[ ] the reasonable hypothesis of innocence was more consistent with the evidence as a whole than was the theory of [Kunze's] guilt."

Kunze further argues that the money recovered from the Reedy cornfield is of no probative value in linking him to the burglary of the Reedy residence because (1) there was no evidence that the money was stolen, and (2) even if it was stolen, there was no evidence that the defendants actually or constructively possessed the money, because (a) nothing was recovered with or near the money to connect it to defendants, and (b) the field from which the money was recovered was not in the defendants' immediate or exclusive control. Kunze also maintains that the money discovered on him at the time he was booked does not connect the defendants to the burglary of the Reedy home because Kunze provided a reasonable, consistent, and extensively corroborated explanation for his possession of that money. Kunze observes that no fingerprints were found on the money which he possessed when he was booked.

Kunze further argues that his admitted criminal acts while at the Reedy farm, such as destroying corn, are consistent with a revenge motive, and as such are ambiguous with regard to his guilt or innocence of the burglary of the Reedy residence. Kunze also asserts that

the footprints leading from the damaged corn to the curtilage of the Reedy residence are of no probative value in implicating him in the burglary because there is no evidence as to when the prints were made, who made them, or the direction in which the person or persons who made the prints were walking.

Furthermore, Kunze argues that the displaced window screen is of no probative value in this case because this condition was not observed on September 25. He notes that no tests were conducted to determine if defendants possessed the instrument which caused the pry marks on that screen. Therefore, Kunze argues that the condition of the screen in the Reedys' utility room did not amount to evidence of forced entry or connect any of the defendants to the illegal entry of the Reedy residence.

Kunze acknowledges that Willis Bolsen testified that he saw Finklea's car drive past his farm at between 10 and 10:15 a.m. on September 25, compared to defendants' testimony that they were still in Decatur at that time. However, Kunze suggests that this aspect of Bolsen's testimony is entitled to little weight in view of the fact that Bolsen was not wearing a watch at the time and because Bolsen stated that when he saw Finklea's car drive by, the sun was high enough in the sky so that it did not interfere with his view of Finklea's car as it traveled.

Kunze concludes his first argument by stating that there is simply no evidence either that he entered the Reedy residence or that he had unexplained possession of recently stolen property. He states that in this case, the prosecution failed to exclude every reasonable theory of innocence and that the jury's verdict could only have resulted from the "piling of inference upon inference." See *United States v. Guzzino* (7th Cir. 1987), 810 F.2d 687, 696-97 (discussing *United States v. Redwine* (7th Cir. 1983), 715 F.2d 315, 319), *cert. denied* (1987), 481 U.S. 1030, 95 L. Ed. 2d 529, 107 S. Ct. 1957.

The State asserts that contrary to Kunze's argument, only an unauthorized entry (as opposed to a forced entry) is required to sustain a residential burglary conviction. Also, the State argues that one could reasonably infer that Chris Reedy conveyed to one or more of the defendants information which facilitated the burglary of the Reedy residence by Kunze and his two codefendants.

The State also contends that Finklea's testimony concerning the defendants' method of exiting the cornfield is not credible. The State suggests that with a falling radiator, it would have been much easier to drive Finklea's car out of the cornfield by the same route by which defendants entered it, rather than by driving over more standing corn

and across a ditch, thus risking further radiator damage. The State argues this evidence establishes Finklea's car was driven into the cornfield not for the purpose of damaging corn, but in order to avoid detection by the Reedys until a "clean getaway" was possible.

The State contends that Kunze's presence near the time and place of the burglary of the Reedy residence and his extensive efforts to flee and hide following his detection on the Reedy property are further evidence that he burglarized the Reedy home. The State suggests that the defendants had a revenge motive for burglarizing the Reedy home and that Kunze's contention that he sought revenge against Mr. Reedy merely by damaging his corn is unreasonable. In conclusion, the State argues that the overwhelming circumstantial evidence and the reasonable inferences which may be drawn therefrom support the jury's guilty verdict.

■ In deciding whether a defendant's guilt of a crime was established beyond a reasonable doubt, the ultimate question is whether, viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime proved beyond a reasonable doubt. (*People v. Collins* (1985), 106 Ill. 2d 237, 478 N.E.2d 267, *cert. denied* (1985), 474 U.S. 935, 88 L. Ed. 2d 274, 106 S. Ct. 267; *People v. Avant* (1989), 178 Ill. App. 3d 139, 532 N.E.2d 1141.) Defendant argues that a case based entirely upon circumstantial evidence is sufficient to support a conviction only if the evidence is inconsistent with any reasonable hypothesis of innocence. We note, however, that the Illinois Supreme Court has recently abandoned this standard and has reaffirmed the standard set forth in *Collins* as the *only* standard to be used in assessing the sufficiency of the evidence to sustain a conviction. See *People v. Eyler* (1989), 133 Ill. 2d 173, 191; *People v. Pintos* (1989), 133 Ill. 2d 286, 291.

■ In the case before us, none of the incriminating circumstantial evidence, standing alone, is sufficient to establish Kunze's guilt. However, the discovery of the cash in the Reedy cornfield, the footprints leading from the area of the damaged corn to the curtilage of the Reedy residence, Kunze's and Finklea's desire to obtain revenge against Mr. Reedy, and their acquaintance with Chris Reedy, as well as their presence in close proximity to the Reedy residence soon after it was burglarized, provide a sufficient basis for a reasonable trier of fact to conclude that the State's evidence was sufficient to prove Kunze guilty beyond a reasonable doubt of the burglary of the Reedy residence.

In evaluating the evidence in this case, the jurors could have considered the generally known fact that when a home is burglarized by

a stranger, it is often ransacked, with the contents being left in a state of great disarray. By contrast, the evidence in this case indicates that the Reedy residence had an orderly appearance when the Reedys returned home from church on September 25. From this, a jury could infer that the person or persons who burglarized the Reedy residence knew exactly where to look for valuables. The evidence concerning the friendship between Chris Reedy, Kunze, and Finklea, the animosity of these individuals toward Mr. Reedy, the missing set of keys and the damaged screen above the shelf where the keys to the Reedy residence were kept—together with the discovery of the defendants in close proximity to the time and place of the burglary of the Reedy residence—justify a further inference that defendants burglarized the Reedy home after being told by Chris Reedy where the keys to the residence were kept and where they would likely find money. Also, the jury could have drawn inferences which were adverse to defendants from the improbability that one driving a car with a loose radiator would attempt to drive it through a field of standing corn and over an open ditch, with a more convenient exit route nearby, unless that individual was attempting to escape from the scene of a serious crime as quickly as possible. See *People v. Songer* (1963), 28 Ill. 2d 433, 192 N.E.2d 861 (trier of fact may consider improbability of defendant's explanation of his presence at scene of crime).

III. THE DUTY OF THE STATE TO PROVIDE THE DEFENDANT WITH INFORMATION REGARDING HIS IMPEACHING CONVICTIONS

The State did not reveal that it possessed certified copies of Kunze's three prior convictions until after Kunze testified as a witness in his own behalf. Kunze's counsel objected to the introduction of these documents and stated that this was the first time she had learned of their existence. She stated that the State's failure to previously disclose these documents "obviously affected my decision whether or not to call [Kunze] as a witness and I am clearly prejudiced by them bringing this in at this late date." The court overruled Kunze's objections to the admission of these documents. In closing arguments, the State noted that Kunze's prior convictions adversely affected his credibility, and the jury was instructed that evidence of a prior conviction could be considered only as it may affect a defendant's credibility.

Kunze notes that Supreme Court Rule 412(a)(v) provides in pertinent part:

> "(a) Except as is otherwise provided in these rules as to matters not subject to disclosure and protective orders, the State

shall, upon written motion of defense counsel, disclose to defense counsel the following material and information within its possession or control:

* * *

(v) any books, papers, documents, photographs or tangible objects which the prosecuting attorney intends to use in the hearing or trial or which were obtained from or belong to the accused." (107 Ill. 2d R. 412(a)(v).)

Kunze maintains that this portion of Rule 412 requires disclosure of records of a defendant's prior convictions which are in the State's possession, regardless of whether the State knows with certainty that the defendant will testify at trial. Kunze maintains that the State's failure to comply with the requirements of Rule 412 in this case should be considered on review as plain error, overcoming his counsel's failure to raise the issue in Kunze's post-trial motion. His principal basis for this argument is that the decision as to whether to testify on one's own behalf at a criminal trial is a fundamental right guaranteed by the fifth and fourteenth amendments (see *Brooks v. Tennessee* (1972), 406 U.S. 605, 32 L. Ed. 2d 358, 92 S. Ct. 1891), and whether one risks impeachment with prior convictions by testifying is an important factor in making this decision. Kunze further maintains that his failure to spontaneously advise his attorney of his prior convictions should not be deemed a waiver of this issue.

Kunze contends that in view of the closely balanced evidence in this case, the State's failure to provide discovery of the records of his prior convictions and the resultant deprivation of his right to make an informed decision as to whether to testify severely prejudiced him.

The State notes that at Kunze's preliminary hearing held on September 30, 1988, Kunze admitted that he had been convicted of a "commercial burglary" as an adult and had been found guilty of two juvenile offenses. The State argues that Kunze thus knew of his prior convictions and had knowledge of the workings of the Illinois criminal justice system. The State also asserts that T. Jeannine Garrett, the attorney who represented Kunze at trial but not at his preliminary hearing, had at least constructive knowledge of his prior convictions.

The State further observes that Rule 412 does not specifically require the production of certified copies of records of convictions. Moreover, the State argues that Rule 412 is limited in scope to documents which the State intends to use at trial and maintains that, in this case, the State's intent to utilize the certified copies of Kunze's convictions was not formulated until after Kunze was called as a witness in his own behalf.

The State further asserts that Kunze waived any discovery violations on the part of the State because no discovery violation was mentioned in Kunze's post-trial motion.

The first issue we must resolve is whether Rule 412 requires the State in advance of trial to disclose records of a defendant's prior convictions which are in the State's possession. Until a defendant has actually taken the stand to testify, the State can never be certain that the defendant will do so. Accordingly, the State's position is that Rule 412 is not applicable to such records in its possession because the State's "intent" to utilize those records is not formulated until after defendant testified.

■■ We find this argument singularly unpersuasive and contrary to the spirit and intent of the supreme court rules on discovery in criminal cases. The State's argument is a throwback to the discredited "sporting theory of justice," in which each side in a criminal case would hide evidence and witnesses it intended to present, hoping to surprise the other side. The truth-seeking nature of trial court proceedings was diminished by these practices, and as a result, the Illinois Supreme Court in 1971 promulgated Supreme Court Rules 412 and 413 to correct such abuses. (107 Ill. 2d Rules 412, 413.) These rules of mutual discovery applicable to criminal cases are designed to foster the truth-seeking nature of criminal trials by providing each side with the information in advance of trial that is necessary for each to prepare for trial. The primary purpose of these rules was the elimination, where possible, of surprise, particularly with regard to documents and other tangible objects.

We recognize that to some extent, surprise may be unavoidable. This is particularly true with regard to testimonial evidence. A witness' trial testimony might differ from his pretrial statements, and on occasion, the party calling that witness might learn of this difference for the first time as the witness is testifying. Even if the party calling the witness knew that the witness was going to change his testimony from that given in a pretrial statement, that party would be under no obligation under supreme court rules of discovery to alert the other side. In this situation, the other side may attempt to discover the change in testimony by interviewing the witness, if the witness consents. In any event, the witness could be impeached by the prior inconsistent statement.

None of this is true, however, with regard to documents and other tangible evidence. The contents of documents and the appearance of tangible objects do not change, and therefore their impact on a jury can often be much greater than the impact of testimonial evidence.

We are not unsympathetic to the argument by the State that it cannot know in advance what evidence will be usable in rebuttal. In many instances that argument has merit. There are instances where the State might legitimately formulate the intent to use some tangible object or document only after the defendant had testified and the State had only then realized the usefulness of such item in rebutting the testimony of the defendant.

■ This analysis, however, has no application to this case. Here, the only unknown was whether the defendant would testify, not what he would say. The State did not care what he would say. The State knew in advance of trial that if the defendant chose to take the stand to testify, the State would be offering in rebuttal the record of defendant's previous convictions. For the State now to argue that it did not "formulate" its intent to use these documents until the defendant actually testified is, at best, disingenuous.

Accordingly, we hold that Supreme Court Rule 412(a)(v) requires the State to furnish to a defendant in advance of trial any records of that defendant's prior convictions which are in the State's possession. We further hold that the State's failure to do so in this case was error.

As the State has pointed out, however, this discovery objection was not mentioned in defendant's post-trial motion. Thus, the State claims that this failure waives the issue for purposes of review by this court. Following *People v. Enoch* (1988), 122 Ill. 2d 176, 522 N.E.2d 1124, we agree and find this issue waived unless the State's discovery violation was plain error.

■ Having given careful consideration to this issue, we find that it was not plain error. In making this determination, we deem significant the defendant's testimony at the preliminary hearing wherein he admitted that he had been convicted of a burglary as an adult and had been found guilty of two juvenile offenses. We view this testimony as revealing a sufficient awareness and understanding by the defendant of his own criminal record so that the State's failure to provide him with formal discovery of that criminal record does not rise to the level of plain error.

### IV. INEFFECTIVE ASSISTANCE OF COUNSEL

Kunze further argues that he was deprived of his right to the effective assistance of counsel because of his counsel's failure to investigate his prior criminal history and because of his counsel's incompetence in advising him to exercise his right to testify. Kunze asserts that as a result of his trial counsel's alleged incompetence, he was de-

prived of his right to make an informed decision as to whether to testify at trial. Kunze further asserts that his counsel was incompetent for counsel's failure to make a motion *in limine* to exclude evidence of his prior convictions on the ground that their prejudicial impact outweighed their probative value. In sum, Kunze maintains that in view of the closely balanced evidence, there can be little confidence that the outcome of his trial would have been the same had his counsel exercised reasonable diligence in preparing his case. For this reason, Kunze argues that his conviction should be reversed and that this cause should be remanded for a new trial with the assistance of competent counsel.

The State argues that when faced with the likelihood of Kunze's two codefendants giving exculpatory statements, it was prudent for Kunze's counsel to have him testify, regardless of any potential impeachment. Furthermore, the State maintains that even if the actions of Kunze's counsel fell below an objective standard of reasonableness, the two codefendants against whom no impeaching convictions were introduced were also convicted of residential burglary. Thus, argues the State, it is not reasonably probable that but for Kunze's counsel's alleged incompetence, the result of the trial would have been different.

Our analysis of Kunze's arguments with regard to the alleged discovery violation and incompetence of his trial counsel must begin with the observation that not all discovery violations in a criminal proceeding warrant imposition of a sanction. A sanction is required only when the defendant demonstrates prejudice resulting from the violation. (See *People v. Pira* (1988), 167 Ill. App. 3d 647, 521 N.E.2d 1236.) Similarly, errors on the part of trial counsel require a new trial only if counsel's deficient performance prejudiced the defense. *Strickland v. Washington* (1984), 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052; *People v. Barnard* (1984), 104 Ill. 2d 218, 470 N.E.2d 1005.

In this case, the determination of whether prejudice resulted to Kunze from the State's discovery violation and the alleged incompetence of his trial attorney depends upon whether Kunze would have testified, even if he had known in advance that the State would use his prior convictions to impeach him. No evidence in the record before us addresses this question, nor is there any evidence regarding consultations between Kunze and his trial counsel or between Kunze's counsel and counsel for the other defendants.

Where, as here, consideration of matters outside of the record is required in order to adjudicate the issues presented for review, the defendant's contentions are more appropriately addressed in proceed-

ings on a petition for post-conviction relief. (Ill. Rev. Stat. 1987, ch. 38, pars. 122—1 through 122—8.) We therefore decline to adjudicate in this direct appeal Kunze's contentions concerning the alleged incompetence of Kunze's trial counsel. An adjudication of a claim of ineffective assistance of counsel is better made in proceedings on a petition for post-conviction relief, when a complete record can be made and the attorney-client privilege no longer applies.

■ There is, however, one aspect of Kunze's claim of ineffective assistance of counsel which we can address at this time. That aspect concerns Kunze's claim that the State's failure to provide his counsel with records of his prior felony convictions deprived his counsel of the opportunity to file a motion *in limine*, seeking to bar their use for purposes of impeaching his testimony. We note that the trial court is not required to entertain such a motion and may instead in its discretion withhold its determination on the admissibility of such prior convictions for impeachment purposes until after defendant testifies. (See *Luce v. United States* (1984), 469 U.S. 38, 43, 83 L. Ed. 2d 443, 448, 105 S. Ct. 460, 464; *People v. Henne* (1988), 165 Ill. App. 3d 315, 327, 518 N.E.2d 1276, 1284.) Accordingly, it cannot be ineffective assistance of counsel to fail to file a motion *in limine* that the trial court need not rule upon. To hold otherwise would open the door to rampant speculation on what the trial court might have done had the motion been filed.

### V. SENTENCING ISSUES

At Kunze's sentencing hearing, the following dialogue occurred:

"[THE COURT]: By way of aside, Mr. Kunze, it would appear that your case could, upon motion, even be an extended term sentence, because of your prior convictions within the 10 year period of time. However, there's been no request of the People for imposition of any such sentence.

[STATE'S ATTORNEY]: Your Honor, It's my understanding the reason, and I may be wrong, you may be correct, that this is a higher class than the others, therefore, he would not have qualified. But there may be a sub-section that I missed.

THE COURT: I think it's the same or higher.

In any event, the defendant, John Lewis Kunze is hereby sentenced to a determinate term of 10 years in the penitentiary system of the Department of Corrections of the State of Illinois, commencing this date; in addition, two years of mandatory supervised release. Judgment is entered on the sentence."

On the basis of the trial court's comments, Kunze contends that the

court may have imposed a 10-year sentence due to the court's erroneous belief that he was eligible for an extended-term sentence. Kunze points out that he was not eligible for an extended term because the two burglaries of which he was previously convicted were Class 2 felonies (Ill. Rev. Stat. 1987, ch. 38, par. 19—1(b)), while residential burglary is a Class 1 felony (Ill. Rev. Stat. 1987, ch. 38, par. 19—3(b)). He notes that an extended-term sentence may be imposed on a defendant who is convicted of a felony only after conviction of a felony of the same or greater class within the 10 preceding years, excluding time spent in custody. Ill. Rev. Stat. 1987, ch. 38, par. 1005—5—3.2(b)(1).

Kunze argues that in this case, it is impossible to determine the weight which the trial court placed on its mistaken belief as to his eligibility for an extended term in sentencing him. He asserts that if the court had not relied on this mistaken belief, the court might have imposed a lesser sentence after giving favorable consideration to the facts that he was only 20 years old, had obtained employment, and had a one-month-old daughter.

The State argues that in view of Kunze's prior convictions, his release from prison only six to seven months prior to the present offense, and the fact that he could have received a maximum 15-year unextended-term sentence for the residential burglary of which he was convicted in the present case (Ill. Rev. Stat. 1987, ch. 38, pars. 1005—5—3(c)(2)(G), 1005—8—1(a)(4)), the 10-year sentence imposed on Kunze was reasonable. The State maintains that in the portion of the sentencing hearing proceedings on which Kunze relies, the State's Attorney corrected the trial judge's misconception as to Kunze's eligibility for an extended term and the trial judge acquiesced in this correction. The State argues that the trial judge's comment, "I think it's the same or higher," refers to the requirements of the statute governing extended-term sentences and not to the classes of Kunze's convictions.

██ The sentence imposed on Kunze was well within the range of unextended-term sentences which the trial court could have imposed on Kunze for a Class 1 felony, and given Kunze's prior offenses, was well within the trial court's discretion. Considering the length of the sentence imposed and the State's Attorney's explicit statement that he did not consider Kunze eligible for an extended term, the record does not support a conclusion that the sentence imposed on Kunze was the product of a mistaken belief on the part of the trial judge as to Kunze's eligibility for an extended term. The trial judge's comments as to Kunze's eligibility for an extended term therefore do not

require remandment of this cause for a new sentencing hearing. *People v. Bourke* (1983), 96 Ill. 2d 327, 449 N.E.2d 1338.

The defendant's conviction and sentence are affirmed.

Affirmed.

GREEN, J., concurs.

JUSTICE STEIGMANN, specially concurring:

In all respects, I concur fully with the majority opinion. However, I take this opportunity to address impeachment by prior conviction and the problems inherent in impeachment procedures now in place. I also propose revised procedures to better accommodate the needs of our criminal justice system.

The defendant was tried before a jury on the charge of residential burglary. After he testified, he was impeached by evidence showing that he had two prior convictions for burglary and one conviction for felony criminal damage to property. These circumstances reveal the ongoing problem in this State and nation regarding the use of prior convictions to impeach a defendant in a jury trial. On the one hand, the State correctly argues that the jury, in evaluating the credibility of a defendant who chooses to take the witness stand, should be informed of the defendant's prior convictions as the jury goes about the difficult task of evaluating the defendant's credibility and considering it along with the credibility of all of the other witnesses in the case. On the other hand, defendants correctly argue that such evidence is often so inherently prejudicial that they cannot receive a fair trial because the jury will simply conclude that they have a propensity to commit crime, especially where the conviction used to impeach the defendant is for the same or similar offense for which the defendant is on trial.

I reluctantly conclude that the adoption of a rule *requiring* procedures discussed in this concurring opinion should only come from the Illinois Supreme Court and not this court.

A. THE ILLINOIS RULE ON IMPEACHMENT OF THE DEFENDANT BY PRIOR CONVICTION

In 1971, the Illinois Supreme Court attempted to clarify and modernize Illinois practice with respect to impeachment by prior conviction. In *People v. Montgomery* (1971), 47 Ill. 2d 510, 519, 268 N.E.2d 695, 700, the Illinois Supreme Court adopted *in toto* the then-proposed Federal Rule of Evidence 609 (Fed. R. Evid. 609), which provided in part:

" 'For the purpose of attacking the credibility of a witness, evidence that he has been convicted of a crime, except on a plea of *nolo contendere*, is admissible but only if the crime, (1) was punishable by death or imprisonment in excess of one year under the law under which he was convicted, or (2) involved dishonesty or false statement regardless of the punishment unless (3), in either case, the judge determines that the probative value of the evidence of the crime is substantially outweighed by the danger of unfair prejudice.' " *Montgomery*, 47 Ill. 2d at 516, 268 N.E.2d at 698, quoting proposed Federal Rule of Evidence 609(a).

The supreme court adopted this rule to address the legitimate concerns of both the prosecution and the defense in criminal cases. Almost two decades of experience suggest the need for further revision.

### B. THE ILLINOIS EXPERIENCE ON IMPEACHMENT OF DEFENDANTS BY PRIOR CONVICTION

Since the adoption of the *Montgomery* rule, there have been dozens of reported cases on appeal in which the admission of a defendant's prior conviction for purposes of impeachment was challenged on appeal as being improper. These cases contain arguments that the trial court abused its discretion in deciding that the probative value of the impeaching conviction outweighed its prejudicial impact. Almost none of these arguments has been successful on appeal.

Examples of cases in which this argument was raised and rejected include the following:

*People v. Poliquin* (1st Dist. 1981), 97 Ill. App. 3d 122, 421 N.E.2d 1362 (defendant on trial for conspiracy to commit armed robbery and murder during the course of the armed robbery properly impeached with his armed robbery conviction), *appeal denied* (1981), 85 Ill. 2d 572;

*People v. Monigan* (5th Dist. 1981), 97 Ill. App. 3d 885, 423 N.E.2d 546 (defendant on trial for murder chooses not to testify after the trial court rules that his conviction of voluntary manslaughter would be admissible for impeachment);

*People v. Johnson* (3d Dist. 1981), 98 Ill. App. 3d 228, 424 N.E.2d 610 (defendant on trial for burglary properly impeached with his burglary conviction);

*People v. Tribett* (1st Dist. 1981), 98 Ill. App. 3d 663, 424 N.E.2d 688 (defendant on trial for possession of a controlled substance—heroin—properly impeached with his conviction for possession of a controlled substance—heroin);

*People v. Medreno* (3d Dist. 1981), 99 Ill. App. 3d 449, 425 N.E.2d 588 (defendant on trial for home invasion, rape, and deviate sexual assault properly impeached with his rape conviction);

*People v. Garlin* (5th Dist. 1981), 101 Ill. App. 3d 716, 428 N.E.2d 697 (defendant on trial for burglary and theft properly impeached with his burglary conviction);

*People v. Hancock* (1st Dist. 1982), 110 Ill. App. 3d 953, 443 N.E.2d 226 (defendant on trial for multiple counts of armed robbery properly impeached with his armed robbery conviction);

*People v. Minor* (5th Dist. 1983), 115 Ill. App. 3d 1046, 451 N.E.2d 1011 (defendant on trial for felony theft involving three automobiles chooses not to testify after the trial court rules that his two convictions of tampering with an automobile would be admissible for impeachment);

*People v. Hall* (1st Dist. 1983), 117 Ill. App. 3d 788, 453 N.E.2d 1327 (defendant on trial for attempt (rape) and armed robbery chooses not to testify after the trial court rules that his conviction of rape would be admissible for impeachment), *appeal denied* (1983), 96 Ill. 2d 562;

*People v. Saunders* (2d Dist. 1984), 122 Ill. App. 3d 922, 461 N.E.2d 1006 (defendant on trial for home invasion, rape, and deviate sexual assault properly impeached with his attempt (rape) conviction);

*People v. Redman* (4th Dist. 1986), 141 Ill. App. 3d 691, 490 N.E.2d 958 (defendant on trial for home invasion and rape chooses not to testify after the trial court rules that his convictions of rape and deviate sexual assault, among others, would be admissible for impeachment), *appeal denied* (1986), 112 Ill. 2d 566;

*People v. Marron* (2d Dist. 1986), 145 Ill. App. 3d 975, 496 N.E.2d 297 (defendant on trial for aggravated battery chooses not to testify after the trial court rules that his conviction of aggravated battery was admissible for impeachment); and

*People v. Rixie* (2d Dist. 1989), 190 Ill. App. 3d 818, 546 N.E.2d 52 (defendant on trial for felony murder and armed robbery properly impeached with his robbery conviction), *appeal denied* (1990), 129 Ill. 2d 570.

The concerns each defendant in the above cases raised about the fairness of his trial were far from groundless. Accordingly, I believe some additional fine-tuning in this area of the law is needed.

### C. NEW PROCEDURES TO BE EMPLOYED IN THE USE OF PRIOR CONVICTIONS TO IMPEACH DEFENDANTS

In order to address the legitimate concerns of both the prosecution

and the defense regarding the impeachment of defendants by prior convictions, the trial courts should henceforth handle such impeachment in the following manner.

When the State is prepared to offer into evidence for impeachment purposes the record of a defendant's prior felony conviction and the trial court has determined that such evidence is admissible for that purpose under the *Montgomery* standards, instead of permitting this evidence to come before the jury in the usual way, the trial court should inform the jury of the felony conviction and of the date and county in which it occurred. Immediately upon doing so, the trial court should orally instruct the jury in accordance with Illinois Pattern Jury Instructions, Criminal, No. 3.13 (2d ed. 1981) (IPI Criminal 2d), unless the defense indicates that it does not wish that instruction to be given.

If the trial court determines that more than one felony conviction is admissible for impeachment purposes, then each such conviction should be treated in the same fashion.

An example of what the trial court should say in informing the jury of the prior conviction is the following: "Ladies and gentlemen, the court now informs you that the defendant, Mr. Smith, was convicted of a felony offense in Macon County, Illinois, in March 1982. He was also convicted of a felony offense in Champaign County, Illinois, in August 1986." In the absence of the defendant's objection, the court would then read IPI Criminal 2d No. 3.13.

If, in its discretion, the trial court chooses to resolve the admissibility of the defendant's prior conviction for impeachment purposes prior to the defendant's testifying, then the trial court should give the defendant the option of having the information concerning his prior conviction told to the jury in the fashion previously described or through the direct examination of the defendant by his counsel. If the defendant chooses the latter option, then the questions asked and the answers given *must* be as follows:

"Q. [Defense counsel]: Mr. Smith, were you convicted of a felony offense in Macon County, Illinois, in March 1982?

A. [Defendant]: Yes.

Q. And were you also convicted of a felony offense in Champaign County, Illinois, in August 1986?

A. Yes."

If the foregoing is the extent of the questions asked by defense counsel and the answers given by the defendant concerning the subject of his prior convictions, then the trial court should bar the prosecution from any cross-examination on that subject.

The trial court should carefully admonish both defendant and de-

fense counsel of the importance of adhering to this precise language. As an example of a problem that might arise without such adherence, assume defense counsel were to ask, "Mr. Smith, did you *plead guilty* to a felony offense in Macon County, Illinois, in March 1982, and did you *plead guilty* to a felony offense in Champaign County, Illinois, in August 1986?" (Emphasis added.) With these questions, defense counsel has put an entirely different "spin" on the information being conveyed to the jury. That "spin" is the suggestion that defendant is the kind of person who, when charged with a crime that he is in fact guilty of, owns up to it and pleads guilty. These questions further suggest that the defendant is pleading not guilty in the case then on trial because this is a charge of which he is not guilty.

A defendant who conveys to the jury that he *pleaded* guilty to a felony offense has thereby opened the door on cross-examination to the State's fully probing the circumstances surrounding that guilty plea. In most instances, those circumstances would reveal that the defendant pleaded guilty not for the reason suggested by defense counsel's question, but because of some plea agreement. Under these circumstances, the full scope of the plea agreement becomes probative and admissible. Because defense counsel almost certainly would elect to keep such information from coming before the jury, the trial courts would, necessarily, need to carefully admonish the defendant and his counsel *in advance* of defendant's testifying to avoid any unpleasant surprises.

There are three exceptions to these procedures set forth above. They are (1) the defendant chooses to have the jury informed of his prior conviction for impeachment purposes in the traditional way, including the name of the offense(s) of which he stands convicted; or (2) the defendant has a prior conviction of a misdemeanor offense that is admissible for impeachment purposes; or (3) the prior conviction to be used for impeachment purposes is for perjury (Ill. Rev. Stat. 1987, ch. 38, par. 32—2), subornation of perjury (Ill. Rev. Stat. 1987, ch. 38, par. 32—3), obstructing justice (Ill. Rev. Stat. 1987, ch. 38, par. 31—4), or any other felony offense the conviction of which, in the judgment of the trial court, has evidentiary value in and of itself, as with the three foregoing offenses. By evidentiary value in this context, I mean offenses which, like perjury, strike at the heart of either the judicial process or at the significance of giving sworn testimony.

Such procedures obviously cannot work when the court is admitting misdemeanor convictions for impeachment purposes under the *Montgomery* standards, namely, those which involve dishonesty or false statement, because by definition the jury cannot be told that the defendant was convicted of a *felony offense* on a certain date in a cer-

tain place. However, the use of misdemeanor convictions to impeach defendants is both less frequent and qualitatively distinct so, in my estimation, special rules need not be designed to accommodate it.

## D. USE IN OTHER JURISDICTIONS OF PRIOR CONVICTIONS TO IMPEACH DEFENDANTS

The procedures delineated above are the result of careful consideration of the problems experienced in Illinois in the administration of the *Montgomery* rule, as well as careful consideration of the decisions from other jurisdictions that have dealt with the same issues. Other jurisdictions have adopted procedures similar to those set forth in the previous section, and in most such jurisdictions, the procedures are termed the "mere fact" rule. Apparently, this is in reference to how only the "mere fact" of the felony conviction is to be brought to the jury's attention, as opposed to informing the jury of the precise offense of which the defendant has been convicted or the circumstances surrounding that prior conviction or both.

The following States have adopted the "mere fact" rule: Florida (*Fulton v. State* (Fla. 1976), 335 So. 2d 280); Idaho (*State v. Palin* (Idaho App. 1983), 106 Idaho 70, 675 P.2d 49); Kentucky (*Sabastian v. Commonwealth* (Ky. 1968), 436 S.W.2d 66); Montana (*State v. Gray* (1968), 152 Mont. 145, 447 P.2d 475); Nevada (*Plunkett v. State* (1968), 84 Nev. 145, 437 P.2d 92); New Mexico (*State v. Williams* (1966), 76 N.M. 578, 417 P.2d 62); Washington (*State v. Coles* (1981), 28 Wash. App. 563, 625 P.2d 713); Nebraska (*State v. Olsan* (1989), 231 Neb. 214, 436 N.W.2d 128); and Wisconsin (*Voith v. Buser* (1978), 83 Wis. 2d 540, 266 N.W.2d 304).

Michigan is the only State that expressly disallows impeachment by an unspecified felony. (*People v. Van Dorsten* (1980), 409 Mich. 942, 298 N.W.2d 421.) Alaska, Connecticut, Oregon, and South Dakota leave to the trial court's discretion whether to use the "mere fact" of a defendant's felony conviction as the basis for impeachment. *City of Fairbanks v. Johnson* (Alaska 1986), 723 P.2d 79; *State v. Anderson* (1988), 16 Conn. App. 346, 547 A.2d 1368; *State v. Sims* (1984), 298 Or. 360, 692 P.2d 575; *State v. Means* (S.D. 1985), 363 N.W.2d 565.

The Federal courts have similarly dealt with this issue. In two cases heard by the Sixth Circuit Court of Appeals, each defendant offered to stipulate to the existence of his prior convictions in exchange for the government's being foreclosed from bringing out the nature of the offense, thereby limiting his impeachment to the "mere fact" of his conviction. In both cases, the Sixth Circuit determined that the government was not required to accept the defendant's stipulation.

*(United States v. Blackburn* (6th Cir. 1979), 592 F.2d 300, 301; *United States v. Burkhart* (6th Cir. 1976), 545 F.2d 14, 15.) See also *United States v. Fields* (6th Cir. 1974), 500 F.2d 69, 70, which appears to have the same holding, although there was some question as to whether the defendant in fact offered to stipulate to the existence of the prior convictions.

A partial dissent was filed in *Fields*, stating in part, "[D]isclosure of information about prior convictions is so unnecessarily prejudicial that it should not be permitted if a defendant is willing to stipulate to their existence." *Fields*, 500 F.2d at 71 (McCree, Circuit Judge, concurring in other part, and dissenting in relevant part).

A concurring opinion was filed in *Blackburn*, which suggested that the government's right to reject this kind of stipulation should be left to the sound discretion of the trial court. (*Blackburn*, 592 F.2d at 301.) The concurring opinion further stated:

> "Disclosure of the nature of prior felony convictions makes it difficult to assure an accused a fair and impartial jury. Without doubt, it places an unnecessary burden upon the presumption of innocence. The government cannot justify the need for routinely referring to the nature of the prior felony convictions in the indictment." *Blackburn*, 592 F.2d at 301.

The Fifth Circuit Court of Appeals has, however, discussed with approval a Federal district court decision rejecting the "mere fact" approach out of concern that its prejudicial effect may be greater than that generated from the disclosure of the specific prior felony. (See *United States v. Shaw* (5th Cir. 1983), 701 F.2d 367, 385, *reh'g denied* (1983), 714 F.2d 544, *cert. denied* (1984), 465 U.S. 1067, 79 L. Ed. 2d 744, 104 S. Ct. 1419.) According to the Fifth Circuit, the failure to reveal the nature of the offense will lead the jury to speculate that the nature of the crime was withheld because it was horrible or extremely heinous. *Shaw*, 701 F.2d at 385.

A most recent Federal decision on point is from the Seventh Circuit Court of Appeals. In *Campbell v. Greer* (7th Cir. 1987), 831 F.2d 700, the Seventh Circuit heard an appeal involving a Federal civil rights suit (see 42 U.S.C. §1983 (1982)) brought by an Illinois prison inmate who argued that the nature of his felony conviction—rape—should not have been revealed to the jury. Instead the jury should only have been allowed to learn that he was a duly convicted felon. The Seventh Circuit made the following observations:

> "There is no precedent for withholding the identity of the felony from the jury when using a conviction to impeach a witness's testimony, and we are not minded to create one. Most jurors

have only an indistinct sense of the range of offenses connoted by the term 'felony'; defining it as a crime punishable by death or imprisonment for more than one year (the federal—not the universal—definition) would add little to their understanding. Rule 609 and the common law tradition out of which it evolved rest on the common-sense proposition that a person who has flouted society's most fundamental norms, as embodied in its felony statutes, is less likely than other members of society to be deterred from lying under oath in a trial by the solemnity of the oath, the (minuscule) danger of prosecution for perjury, or internalized ethical norms against lying. If so, this is something a jury should be permitted to take into account in evaluating a witness's believability. The jury cannot do this if all it is told is that the witness was convicted of a 'felony.' The crime must be named. It always has been where impeachment by a prior conviction has been permitted." *Campbell*, 831 F.2d at 707.

I agree with the Seventh Circuit's statement of the reasons which underlie the admissibility of a felony conviction for impeachment purposes, but disagree with the court's ultimate conclusion. I am convinced that telling a jury that a defendant is a convicted felon conveys all the information that the State has any legitimate interest in conveying, thereby enabling the jury as it evaluates the defendant's credibility to consider that he has in the past seriously violated societal norms. See *People v. Medreno* (1981), 99 Ill. App. 3d 449, 452-53, 425 N.E.2d 588, 591, for a further discussion of the policy underlying the admissibility of a prior felony conviction.

Another way of looking at this issue is to view it as one of expectations. A jury may reasonably expect that a person who takes the witness stand and is sworn to tell the truth will feel moral and societal pressures to do so. Telling a jury that a witness has a prior felony conviction informs the jury that on some occasion in the past, this witness has seriously violated societal (and probably moral) rules, thereby permitting the jury to infer, if it so chooses, that this witness may feel fewer moral and societal pressures to tell the truth than would be felt by a witness who has no prior felony conviction. If the jurors draw this inference, they may use it along with all the other evidence in the case as they evaluate the credibility of that witness. In sum, a convicted felon *may be* less worthy of belief *solely* because of that felony conviction than a witness who is not a convicted felon. Whether in a given case a particular witness should have his or her credibility adversely affected by reason of having a prior felony conviction is a matter for the jury to determine. My point is that the jury has a legitimate inter-

est in learning this information and using it, if it so chooses, in the manner stated.

Despite the Seventh Circuit's analysis, I am unpersuaded that a jury cannot not properly evaluate the information concerning a witness' status as a convicted felon unless the jury is specifically told what crime he was convicted of. Whatever slight probative value that additional information might add (and frankly I doubt that it adds any), the profound prejudicial effect that additional information usually causes clearly outweighs whatever minimal probative value it might possess.

The obvious response to the objection raised by the Fifth Circuit to the "mere fact" mode of impeachment is to give the defendant the option, as proposed above, of selecting which mode of impeachment the court should use. I am confident experience will demonstrate that the overwhelming majority of defendants will opt for the "mere fact" method.

### E. RULE GOVERNING IMPEACHMENT OF DEFENDANTS BY PRIOR CONVICTIONS IS APPLICABLE TO OTHER WITNESSES AS WELL

These procedures for the impeachment of defendants by their prior felony convictions should be equally applicable to witnesses other than defendants. While a prime factor in setting forth these procedures is to keep from the jury prejudicial information concerning the defendant on trial, that is not the only factor. This rule strengthens the truth-seeking processes of jury trials when applied either to a defendant or to other witnesses. Nor does it matter whether those witnesses are called by the State or the defense. The previous analysis concerning how the information regarding a witness' prior felony conviction should be utilized by the jury was not premised upon the witness in question being a defendant, and it is fully applicable to other witnesses. The nature of the non-defendant witness' felony conviction is a mere collateral matter which adds nothing to the proceedings and which may confuse or distract the jury from its real work.

### F. CONCLUSION

Trial courts have the discretion to begin to employ these procedures immediately, and they should do so in order to provide both the defendant and the State with the fair trial to which each is entitled.