THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. PATRISIO VILLANUEVA, Defendant-Appellant.
Fourth District   No. 4—91—0833

Opinion filed June 29, 1992.

Daniel D. Yuhas and Lawrence Bapst, both of State Appellate Defender's Office, of Springfield, for appellant.

Thomas J. Difanis, State's Attorney, of Urbana (Norbert J. Goetten, Robert J. Biderman, and Dale M. Wood, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE STEIGMANN delivered the opinion of the court:

In September 1991, a jury convicted defendant, Patrisio Villanueva, of burglary (Ill. Rev. Stat. 1989, ch. 38, par. 19—1(a)). At defendant's November 1991 sentencing hearing, the trial court found him to be a Class X offender under section 5—5—3(c)(8) of the Unified Code of Corrections (Unified Code) (Ill. Rev. Stat. 1989, ch. 38, par. 1005—5—3(c)(8)) and sentenced him to 20 years in prison. The trial court also ordered defendant to pay $350 in restitution. Defendant appeals, arguing that (1) the State did not prove him guilty beyond a reasonable doubt, (2) the trial court improperly sentenced him as a Class X offender, and (3) the trial court abused its discretion in ordering him to pay restitution. We affirm.

## I. FACTS

On May 22, 1991, Urbana police officer Troy Ray Phillips was in uniform on routine patrol in a marked squad car when, a few minutes before 10 p.m., he heard a radio dispatch sending two other Urbana police officers to 1201 East University Avenue in Urbana in response to a silent alarm alert. The business located at that address is Tire Central. Phillips proceeded to that location as well and, shortly after

arriving, observed three white males running westbound on the railroad tracks approximately 75 yards away from him. He radioed what he had seen and, along with Urbana police sergeant Michael Metzler, who had joined Phillips, began to pursue the suspects. Phillips testified that during the course of his chase, he yelled, "stop, police!" several times.

Phillips observed that the suspect nearest to him wore blue jeans and a gray jacket, and the other suspects wore blue jeans and T-shirts. The chase led Phillips into the backyards of residences located near the railroad tracks. As he searched a weeded area between the yards and the tracks, Phillips found defendant hiding in the weeds. Defendant was wearing a Chicago Cubs T-shirt and blue jeans. Defendant was sweating profusely and had many green weeds and briars on his jeans. Phillips later found the other two suspects as well. He found the first, Darin Flanery, approximately three to six feet directly east of defendant. He found the third, Thomas Kenny, 20 to 30 feet east of Flanery. Kenny was wearing a gray jacket and jeans. Flanery and Kenny were also sweating profusely and also had many briars on their jeans and shoes. Phillips obtained the suspects' shoes and clothing and later sent them to the State crime lab for analysis.

Urbana police officer Patrick Connolly testified that the Tire Central facility includes a large, one-story warehouse, an adjacent building attached to the westernmost side of the warehouse, and a chain link fence around the premises. The warehouse has two overhead doors on the south side and one overhead door on the north side. The building also has a silent alarm that signals any motion detected within the building or when anyone tries to enter the building. The alarm system automatically notifies the alarm company by telephone, and the company in turn contacts the police.

On the late morning of May 23, 1991, Connolly, Phillips, and Urbana police sergeant Michael Miller returned to Tire Central and retraced the route that Phillips and Metzler took in their foot pursuit of the suspects arrested the previous evening. As they did so, Connolly discovered a pair of red bolt cutters and a large pipe wrench. Connolly described the bolt cutters as "used to cut metal, primarily fence." Connolly also found two pairs of brown cloth gloves approximately 20 feet south of where he found the pipe wrench and the bolt cutters. A short distance away, he found a similar glove in the backyard of a residence along the path that the three suspects had run.

James Demetral, a rental manager for a U-Haul trailer rental in Hickory Hills, Illinois, testified that on May 21, 1991, at approximately 5:30 p.m., defendant, with two other men, rented a 14-foot U-

Haul truck from him. Defendant paid a cash deposit for the rental, said that he was going to use the truck "locally in the Burbank area," and would return it the next day. On the afternoon of May 23, 1991, Connolly went to the Charter House Inn, a motel located approximately one-half to three-fourths of a mile west of Tire Central to investigate a report that a U-Haul truck had been abandoned in the motel's parking lot. The U-Haul truck Connolly found abandoned in the motel parking lot was the truck defendant had rented the day before.

Sergeant Miller testified that on May 22, 1991, at 9:57 p.m., he received a report of an alarm condition on the silent burglar alarm at Tire Central. He proceeded to that location. When he arrived, he noticed that the west side bay door was halfway up and tires were stacked both in the entrance and lying just outside the door. He radioed that he believed a burglary was in progress, called for assistance, and then walked toward the railroad tracks that ran nearby. He saw three persons running southwest across the railroad tracks. Miller radioed his observations but did not chase the people. He watched them continue to jog and then slow into a brisk walk. Miller followed them at a distance and noticed that they kept looking over their shoulders. As the suspects reached an intersection, a civilian vehicle (unrelated to the police investigation) turned the corner, and all three suspects "bolted and took off running westward." At that point, Miller lost sight of them. A short time later, Miller went to the location where Phillips had arrested three individuals in a grassy area near the railroad tracks. Miller identified defendant and his codefendants as the three individuals he had been watching. Miller did not believe that the suspects saw him as he first trailed them down the railroad tracks.

Kurt Steger, the manager of Tire Central, testified that at any given time, he probably had $450,000 worth of tire inventory, consisting of thousands of tires. Steger testified that the building had a dock area for trucks that was four to five feet high, and a chain link fence at the rear portion of the building, which faced to the west.

On May 22, 1991, Steger closed the business at 5:30 p.m. and left the premises about 8:30 to 9 p.m. At that time, the overhead doors were closed and locked with a padlock. When Steger left, the warehouse was neat, no tires were stacked next to the overhead doors, nor were any in the grassy area outside of the warehouse.

Sometime after 10 p.m. on May 22, 1991, Steger's security system summoned him back to the business. When he arrived, he saw police officers present and an overhead door halfway up and some tires lying outside the door. He also noticed stacks of tires had been tipped

over inside the warehouse and that the chain link fence had been cut in two places. The padlock that had been on the overhead door was gone and Steger has never found it. Steger estimated that about 30 to 40 tires were stacked up near the door area. He estimated the weight of those tires as 10 to 15 pounds each. Steger was shown a photograph of the U-Haul truck that defendant had rented and estimated that 250 to 300 tires could fit within that truck.

Illinois State Police trooper Jerry Pea, a trained crime scene technician, testified that on May 22 at about 11:55 p.m., he processed the crime scene at Tire Central in Urbana. After speaking to some Urbana police officers, Pea noticed some footwear impressions in the dust within the Tire Central warehouse. He used a "gel lifter" on one of the impressions and made a gelatin lift of the footwear impression that he observed in the dust.

Thomas Gamboe, a forensic scientist employed at a State crime lab, testified that he examined the gelatin lift that Pea made and compared it with the shoe taken from Darin Flanery. Gamboe opined that Flanery's shoe made the footwear impression on the gelatin lift.

Defendant offered no evidence, and the jury convicted him of burglary.

## II. SUFFICIENCY OF THE EVIDENCE

Defendant first argues that although the State's evidence shows he was present near the Tire Central building, it failed to prove beyond a reasonable doubt either that he entered the building or that he was legally accountable for someone else who burglarized that building. Defendant concedes that forensic evidence established that his codefendant Flanery's shoe made the footprint discovered in the warehouse but maintains that no evidence shows that he aided Flanery in planning or committing the warehouse burglary.

In response, the State maintains that the evidence proving defendant's guilt of burglary based upon accountability shows the following: (1) the day before the Tire Central burglary, defendant rented a U-Haul truck in a Chicago suburb and told the rental clerk that he was going to use the truck locally and would return it the next day; (2) two other men—presumably Flanery and Kenny—accompanied defendant when he rented the truck; (3) Tire Central had been burglarized, and numerous tires, weighing 10 to 15 pounds each, had been stacked near the doors, requiring a truck to transport the intended loot; (4) after Tire Central had been broken into and the tires stacked, the police saw defendant and his accomplices walking along a route that would take them from the burglarized warehouse to the U-

Haul truck parked only one-half to three-fourths of a mile from Tire Central; (5) because defendant and his accomplices were initially unaware that their presence in the warehouse had been detected, they were proceeding with their original plan of walking back to where they had parked the U-Haul truck, intending to drive it back to the burglarized warehouse so that they could load it with stolen tires; (6) the burglary tools and gloves found along the path that defendant and his accomplices took as they fled near the railroad tracks, as well as the short period of time that passed from the time the manager of that warehouse left until the silent alarm signaled the Tire Central break-in, demonstrates that either defendant or his accomplices cut the chain link fence and burglarized the warehouse; (7) the gelatin lift of Flanery's shoeprint taken from the warehouse floor proves that at least Flanery went inside the warehouse; and (8) at the time of defendant's capture, he and his accomplices were all found in the same area, out of breath from running, and each had his clothing covered with green stains, weeds, and briars.

■ Both the prosecutor and defense counsel argued to the jury about the State's claim of defendant's legal accountability for the burglary, and the jury concluded that the State had proved defendant guilty as charged beyond a reasonable doubt. Based upon our review of this record, we are satisfied that a rational trier of fact, viewing the evidence in the light most favorable to the prosecution, could have found that the State proved beyond a reasonable doubt that defendant committed the crime of burglary. See *People v. Collins* (1985), 106 Ill. 2d 237, 261, 478 N.E.2d 267, 277; *People v. Kunze* (1990), 193 Ill. App. 3d 708, 720, 550 N.E.2d 284, 292.

### III. The Order Of Restitution

Defendant next argues that the trial court improperly ordered him to pay $350 in restitution because he had been sentenced to 20 years in prison, was unemployed, indigent, and had no assets. Defendant maintains that an order of restitution under these circumstances amounts to an abuse of the trial court's discretion. We emphatically disagree.

After defendant's initial arrest in May 1991, he posted a $7,500 cash bond in July 1991 to secure his release from custody. In August 1991, he was arrested again based upon the State's petition that alleged defendant had committed another criminal offense. He was then held in custody until the trial court sentenced him on November 1, 1991.

In September 1991, immediately after the jury returned its verdict finding defendant guilty of burglary, the trial court vacated the previous $200,000 bail it had set when defendant was arrested the second time (which defendant had not been able to post), and in part granted defendant's motion, releasing $6,000 to defendant of the $7,500 he had previously posted.

In support of defendant's motion to release the cash bond previously posted, defendant's counsel stated that the money had been posted by family members and a friend, and that some of the money had been borrowed. He also stated the following: "[T]hey are anxious to get the money back and they are just putting pressure on me to take some action to try to get it back to them. After somebody *** has been found guilty, they become very suspicious of what happened to the bond money and how the attorney fits in."

The State objected to defendant's request to release the cash bond, pointing out that the court could take court costs from it "and perhaps [the court] may order restitution from the bond posted." The court asked the prosecutor what the restitution might be, and she responded as follows: "I don't know. I am not going to stand here and suggest that. I am not sure what it would be. I don't think it would be more than $200, but I don't know that." The court then directed that $6,000 of the $7,500 previously posted be returned to defendant and ordered that he be held without bond pending sentencing. The court retained $1,500, explaining, "That should cover the court costs and restitution from what people have told me."

The initial presentence report prepared for defendant's sentencing hearing indicated that total damage to the Tire Central building was $486 and that the business had an insurance deductible of $250. A later addendum to the presentence report stated that it would cost Tire Central $1,140 to restore the fencing, barbed wire, overhead doors, paneling, and door tracks. A written estimate from a person contracted by Tire Central to do the work accompanied the addendum. The addendum also contained a statement from Steger that he would prefer to have the defendant pay for all the damage because Steger feared that his insurance company would raise his insurance premiums if Steger turned in this claim to that company.

The presentence report also indicated that court costs would be $80. Section 110—7(f) of the Code of Criminal Procedure of 1963 (Code) (Ill. Rev. Stat. 1989, ch. 38, par. 110—7(f)) requires that 10%—in this case $750—of the cash bond posted be retained by the Champaign County circuit clerk as the circuit clerk's bond fee. As a result, in order to pay court costs and the circuit clerk's bond fee, $830 had

to be deducted from the $1,500 the trial court ordered retained to be used for restitution. However, the trial court ordered that only $350 of the $670 that was available for restitution be so used. The remaining $320 that was not used for restitution was simply returned to defendant.

■ In *People v. Nasser* (1991), 223 Ill. App. 3d 400, 410, 584 N.E.2d 1010, 1016, this court reaffirmed its earlier holding in *People v. Strebin* (1991), 209 Ill. App. 3d 1078, 1084, 568 N.E.2d 420, 424, that the Illinois General Assembly intended, *in every criminal case where possible*, to achieve two goals: "(1) to make victims whole for *any* injury received at the hands of the convicted criminal; and (2) to make criminals pay *all* of the costs which arise as a result of injuries the victim suffered." (Emphasis in original.) We also wrote the following:

> "[W]e believe trial courts have a duty, to the extent possible, to order restitution to benefit victims so that they can avoid the bother, expense, and delay too often present in the civil justice system. This duty is mandated by the legislative intent underlying section 5—5—6 of the Code (Ill. Rev. Stat. 1989, ch. 38, par. 1005—5—6). The focus of concern for the courts ought to be that victims of crime, who have been forced to endure the suffering, inconvenience, and hardship frequently associated with that status, receive remuneration for the damages they have suffered. (See *Simon & Schuster, Inc. v. Members of the New York State Crime Victims Board* (1991), 502 U.S. ____, ____, 116 L. Ed. 2d 476, 488-89, 112 S. Ct. 501, 509 ('There can be little doubt *** that the State has a compelling interest in ensuring that victims of crime are compensated by those who harm them').) Courts should be more concerned with the need to make whole the victims of crime rather than with the *civil* interests of convicted criminals." (*Nasser*, 223 Ill. App. 3d at 411, 584 N.E.2d at 1017.)

We also add that trial courts should concern themselves more with using cash bonds posted by defendants or their surrogates to pay restitution than with *any* interests of defendant or those surrogates regarding the cash posted. After all, we note that in the very case before us, there appears on defendant's bail bond form a notice entitled, "NOTICE TO PERSON POSTING BAIL BOND," that reads, in pertinent part, as follows:

> "Any sum deposited as money bond *** may be used in the court's discretion for the payment of *** *restitution* ***. Therefore, money posted by the defendant or by someone else

on his/her behalf may, *or may not*, be returned at the conclusion of the case." (Emphasis added.)

Immediately under the above notice, the person who posted the $7,500 cash bond in the present case signed a certificate acknowledging that he had read the notice.

■ On this record, we reject defendant's claim that the trial court erred in requiring that he pay $350 in restitution from the cash bond previously posted. In so holding, we note that the trial court could have ordered defendant to pay the *entire* $670 that was available for restitution. The court did not need to take action on September 11, 1991, to partially grant defendant's motion to have the $7,500 cash bond returned to defendant, when the court at the same time set his sentencing on November 1, 1991. Instead, the court would have been fully justified to wait until defendant's sentencing hearing to rule upon his motion to release the $7,500 cash bond. Had the court so waited, it could have ordered defendant to pay *all* of the $1,140 in restitution that Tire Central needed to be made whole as a result of defendant's crimes.

It should go without saying that the concerns defendant's counsel expressed—about possibly offending the sensibilities of defendant's surrogates who posted the cash bond for him if the $7,500 cash bond were not released—should not have long troubled or concerned the trial court. Those surrogates were not drafted into that role; they elected to put up their cash *in defendant's name* to secure his release, and they were warned in advance of the possible consequences of their doing so. As opposed to the persons who posted defendant's bond, we emphasize that Tire Central was *not* a volunteer.

This record presents an additional reason why the trial court might want to retain *all* of the $7,500 cash bond that defendant had posted until the time of defendant's sentencing on November 1, 1991. We note that immediately after the court sentenced defendant, it granted his request to appoint the office of the State Appellate Defender as his counsel on appeal. Section 113—3.1 of the Code (Ill. Rev. Stat. 1989, ch. 38, par. 113—3.1) provides that the court may use cash bonds defendants have posted to pay for the services of court-appointed counsel. Section 113—3.1(b) of the Code (Ill. Rev. Stat. 1989, ch. 38, par. 113—3.1(b)) authorizes the court to assess up to $2,500 for court-appointed counsel on appeal, and section 113—3.1(e) of the Code (Ill. Rev. Stat. 1989, ch. 38, par. 113—3.1(e)) explicitly mentions appointments of the State Appellate Defender as a basis for ordering defendants to pay for that office's appellate services. Had the trial court not released $6,000 of the defendant's cash bond prior

to November 1, 1991, it could have held up to $2,500 from that bond to meet the costs of counsel that the court had just appointed on that date to handle defendant's appeal. The record before us suggests no reason why such an order would not have been an entirely appropriate exercise of the trial court's discretion, thereby correctly placing the taxpayers of the State of Illinois, who fund the office of the State Appellate Defender, in a position superior to that of defendant's surrogates, who elected to post his cash bond.

IV. DEFENDANT'S SENTENCING AS A CLASS X OFFENDER

■ The trial court found that defendant had prior convictions of burglary and residential burglary and thus was eligible to be sentenced as a Class X offender under section 5—5—3(c)(8) of the Unified Code. Defendant argues that the trial court erred in sentencing him as a Class X offender under that section because the record is devoid of any evidence regarding the dates upon which he committed the burglary and the residential burglary which provided the basis of the court's treating him as a Class X offender. We disagree.

In *People v. Williams* (1992), 149 Ill. 2d 467, the Illinois Supreme Court addressed this identical argument and rejected it. In *Williams*, as in the present case, the trial court received documents at the sentencing hearing that listed the two prior felonies of the defendant but did not provide the dates on which those felonies had been committed. (*Williams*, 149 Ill. 2d at 473.) The supreme court rejected the argument that the State had a burden of proof regarding the Class X provisions of section 5—5—3(c)(8) of the Unified Code (*Williams*, 149 Ill. 2d at 491) and then wrote the following:

> "Essentially, defendants contend that the presentence reports were deficient for the purpose of imposing a Class X sentence because the commission dates of their prior felonies were not listed in the report. Any claimed deficiency or inaccuracy within a presentence report must first be brought to the attention of the sentencing court, and a failure to do so results in waiver of the issue on review. [Citations.] Every defendant in the cases before us neglected to notify the sentencing court that he believed the presentence report was deficient because the report failed to include the dates upon which the felonies were committed.

> * * *

> *** [Defendants'] failure to object to the sufficiency of the reports at the sentencing hearing results in waiver of the issue on review. No purpose would be served by giving the parties

notice of the presentence reports at least three days prior to the imposition of sentence (Ill. Rev. Stat. 1987, ch. 38, par. 1005—3—4(b)(2)) if we were to permit them to later raise objections to the presentence reports for the first time on appeal." (*Williams*, 149 Ill. 2d at 493-95.) Similarly, in the present case, defendant failed to object or raise any question when the trial court stated that it had to treat defendant as a Class X offender, as the State had argued. Based upon *Williams*, we reject defendant's argument that the trial court erred by sentencing him as a Class X offender.

## V. CONCLUSION

For the reasons stated, we affirm defendant's conviction and sentence.

Affirmed.

KNECHT and LUND, JJ., concur.