THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. WILLIE JOHNSON, Defendant-Appellant.

Fourth District   No. 4—99—0267

Opinion filed June 27, 2001.

STEIGMANN, P.J., specially concurring.

Daniel D. Yuhas and Scott A. Lerner, both of State Appellate Defender's Office, of Springfield, for appellant.

John C. Piland, State's Attorney, of Urbana (Norbert J. Goetten, Robert J. Biderman, and Thomas R. Dodegge, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE MYERSCOUGH delivered the opinion of the court:

In June 1998, the State charged defendant, Willie Johnson, with one count each of home invasion (720 ILCS 5/12—11 (West 1996)) and armed robbery (720 ILCS 5/18—2(a) (West 1996)) and two counts of attempt (aggravated criminal sexual assault) (720 ILCS 5/8—4(a) (West 1996); 720 ILCS 5/12—14(a)(1), (a)(2) (West Supp. 1997)). In January 1999, a jury found defendant guilty of armed robbery and attempt (aggravated criminal sexual assault) but found him not guilty of home invasion. In March 1999, the trial court sentenced defendant to an extended 60-year prison term for armed robbery and a consecutive 15-year prison term for attempt (aggravated criminal sexual assault). The trial court found that in regard to the conviction for armed robbery, defendant had inflicted great bodily harm on the victim and, accordingly, defendant would be required under Public Act 90—592 (Pub. Act 90—592, § 5, eff. June 19, 1998 (1998 Ill. Laws 1284, 1284-94)) to serve 85% of his sentence because of the "truth-in-sentencing"

aspect of that legislation. Defendant immediately filed a postsentencing motion asking the trial court to reduce his sentence. The trial court denied defendant's motion.

On appeal, defendant argues that the trial court erred in (1) denying his motion for discharge for violating his speedy-trial rights, (2) failing to give a jury instruction for the included offense of robbery, (3) allowing the State to use the mere-fact method of impeaching him with prior felony convictions, (4) permitting the State to present two chain-of-custody witnesses who had never been disclosed to defendant in discovery, (5) failing to grant a directed verdict when the State failed to present sufficient evidence to convict him beyond a reasonable doubt of the offenses charged, (6) abusing its discretion by imposing consecutive sentences upon him, and (7) finding that truth in sentencing should apply to his conviction for armed robbery. We affirm.

## I. BACKGROUND

In June 1998, the State charged defendant as stated. In August 1998, the State moved for a continuance pursuant to section 103—5(c) of the Code of Criminal Procedure of 1963 (Code) (725 ILCS 5/103—5(c) (West 1996)), arguing that it could not obtain and test certain deoxyribonucleic acid (DNA) evidence within the initial 120 days provided in section 103—5(a) of the Code (725 ILCS 5/103—5(a) (West 1996)). Pursuant to section 103—5(c), the State requested an additional 120 days beyond the initial 120 days within which the State must prosecute defendant, for a total maximum of 240 days from the day that defendant was taken into custody. The trial court granted the State's motion over defendant's objection.

In January 1999, defendant filed a motion to discharge, arguing that the State failed to bring him to trial in a timely manner in violation of his speedy-trial rights. The trial court denied defendant's motion.

Later that month, the trial court conducted a jury trial. At trial, the 55-year-old victim, J.S., testified about how defendant brutalized her. J.S. testified that on June 20, 1998, she hosted a garage sale at her home from 7 a.m. until 4 p.m. J.S. testified that defendant had come three times to her garage sale that day. J.S. had given defendant's girlfriend clothes and cooking pans. Defendant purchased a telephone cord from J.S. and witnessed J.S. exchanging cash with other patrons.

That evening a friend came to check on J.S. and bring her supper. The friend did not lock the door as she left. J.S. fell asleep watching television in her bedroom sometime during the 10 p.m. news.

J.S. testified that, in the early morning hours, she awoke when de-

fendant grabbed her hair and dragged her out of bed and into the living room facedown, repeatedly striking her head with a metal BB handgun and screaming at her to give him the money. After defendant brutalized J.S. with repeated blows to her head and threatened to kill her, defendant dragged her by the hair onto the porch to show codefendant Abrian Robinson defendant's "work." Defendant then dragged J.S. back into the living room and again demanded money. J.S. refused, and defendant pulled her head up while Robinson pulled his penis out of his pants. Defendant told J.S. to "suck [Robinson's] dick." J.S. refused, and defendant struck her across the face with the BB handgun. Defendant told Robinson to grab J.S.' arm and help him put her on the bed. J.S. then told defendant that the money was in her bedroom in a drawer. Defendant then dragged J.S. into the bedroom, and J.S. got the proceeds of her garage sale from her drawer. Defendant dragged J.S. back into the living room, pointed the pistol at her, and clicked it. At that time, defendant realized that Robinson had left. Defendant turned and ran away. J.S. then called the police, and the police took her to the hospital.

J.S. suffered numerous lacerations to her head that required stitches. In addition to the lacerations, J.S. had bruises on her back, shoulder, and knees. As a result of these injuries, J.S. spent three days in the hospital.

Robinson also testified for the State and corroborated much of J.S.' account. The State produced various objects found in defendant's and Robinson's apartments that had been taken from J.S.' residence, including medication, an asthma inhaler, and a Link card.

The State produced chain-of-custody witnesses who had possessed, transported, stored, or tested various pieces of evidence. The State produced two chain-of-custody witnesses who had not been disclosed to defendant in discovery, in violation of Supreme Court Rule 412 (134 Ill. 2d R. 412). The trial court permitted the State to call the witnesses over defendant's objection but allowed defendant's attorney to interview both witnesses prior to their testifying. The State also produced a black metal BB handgun found in defendant's apartment, and experts testified that the handgun had bloodstains containing DNA consistent with J.S.' DNA profile.

The jury found defendant not guilty of home invasion but found him guilty of armed robbery and attempted aggravated criminal sexual assault. That same day, defendant filed a motion for judgment notwithstanding the verdict or, in the alternative, a new trial. Two days later, defendant filed an amended motion for judgment notwithstanding the verdict or, in the alternative, a new trial.

In March 1999, the trial court denied defendant's motion and

sentenced him as stated. Defendant immediately filed a postsentencing motion asking the trial court to reduce his sentence. The trial court denied defendant's motion. This appeal followed.

## II. ANALYSIS

### A. Speedy-Trial Rights

Initially, defendant argues that the trial court erred by denying his motion for discharge for violating his speedy-trial rights. We disagree.

• 1 "A defendant charged with an offense has both a constitutional and a statutory right to a speedy trial." *People v. Huff*, 195 Ill. 2d 87, 91, 744 N.E.2d 841, 843 (2001), citing U.S. Const., amends. VI, XIV; Ill. Const. 1970, art. I, § 8; 725 ILCS 5/103—5 (West 1996). Section 103—5 embodies a defendant's speedy-trial rights as guaranteed by section 8 of article I of the Illinois Constitution. See *People v. Reimolds*, 92 Ill. 2d 101, 106, 440 N.E.2d 872, 874 (1982). The Illinois speedy-trial statute provides an enforcement mechanism for violations of this constitutional right. *People v. Woolsey*, 139 Ill. 2d 157, 165, 564 N.E.2d 764, 767 (1990); *People v. Healy*, 293 Ill. App. 3d. 684, 689, 688 N.E.2d 786, 789 (1997). Section 103—5 of the Code provides, in pertinent part:

> "(a) Every person in custody in this State for an alleged offense shall be tried by the court having jurisdiction within 120 days from the date he was taken into custody unless delay is occasioned by the defendant ***.
>
> .* * *
>
> (c) *** If the court determines that the State has exercised without success due diligence to obtain results of DNA testing that is material to the case and that there are reasonable grounds to believe that such results may be obtained at a later day, the court may continue the cause on application of the State for not more than an additional 120 days.
>
> (d) Every person not tried in accordance with subsections (a) *** and (c) of this [s]ection shall be discharged from custody or released from the obligations of his bail or recognizance." 725 ILCS 5/103—5(a), (c), (d) (West 1996).

Accordingly, the State must bring defendant to trial within the statutory period of 120 days under the speedy-trial statute (*Reimolds*, 92 Ill. 2d at 106, 440 N.E.2d at 875), and, if defendant is in custody, no demand is required to begin the running of the 120-day period (*People v. Garrett*, 136 Ill. 2d 318, 324, 555 N.E.2d 353, 356 (1990)). However, under section 103—5(c), the State can ask the trial court to grant an additional 120-day period to enable it to procure DNA testing results that it could not obtain with due diligence in the initial 120 days. 725 ILCS 5/103—5(c) (West 1996).

●2 In the present case, defendant was taken into custody June 22, 1998, and was unable to post bond. On July 30, 1998, the State filed a motion to continue to enable it to receive DNA analysis of bloodstains on certain crucial pieces of evidence, including the BB handgun. In its motion, the State requested that the trial court grant an additional 120 days beyond the original 120-day period allotted under section 103—5(a) to obtain the DNA results.

On appeal, defendant argues that section 103—5(c) permits a trial court to grant an additional 120-day period only from the day it granted the State's motion. Specifically, with regard to the present case, defendant argues that the trial court could grant an additional 120 days only from July 30, 1998, when the trial court granted the State's motion to continue. According to defendant, under section 103—5(c), the trial court could not grant the State up to a total of 240 days to bring defendant to trial. We disagree.

Section 103—5(c) gives the trial court authority to continue a defendant's case beyond the initial 120-day period provided in section 103—5(a), if the court determines that (1) the State has exercised due diligence to obtain DNA test results, (2) DNA analysis is material to the case, and (3) reasonable grounds exist to believe that the test results may be obtained at a later day. Section 103—5(c) permits the trial court to continue defendant's case "for not more than an additional 120 days." 725 ILCS 5/103—5(c) (West 1996). Despite defendant's arguments to the contrary, section 103—5(c) allows the trial court to continue cases involving DNA testing for a maximum of 120 days beyond the initial 120-day period provided in section 103—5(a), for a total maximum period of 240 days, without violating a defendant's speedy-trial rights. We note, however, that section 103—5(c) makes it incumbent upon the State to apply for such a continuance, and the length of any extension up to the maximum necessarily depends upon the State's request.

In the present case, the State requested an additional 120 days beyond the basic 120 days provided for in section 103—5(a). The trial court granted the State's motion. Because the State brought defendant to trial within the permissible statutory time, the trial court did not err by denying defendant's motion to discharge him.

## B. Jury Instructions

The material in the remaining sections is nonpublishable under Supreme Court Rule 23. 166 Ill. 2d R. 23.

### III. CONCLUSION

For the reasons stated, we affirm the trial court's judgment.

Affirmed.

McCULLOUGH, J., concurs.

PRESIDING JUSTICE STEIGMANN, specially concurring:

Although I agree with the majority's decision, I write separately to address the mere-fact method of impeachment, which the supreme court has recently rejected for the second time. The supreme court's decision two years ago in *People v. Atkinson*, 186 Ill. 2d 450, 713 N.E.2d 532 (1999), was deeply flawed, and the supreme court in *People v. Cox*, 195 Ill. 2d 378 (2001), reaffirmed the erroneous position it had taken in *Atkinson*.

Under the mere-fact method of impeachment, a jury is permitted to learn only of the "mere-fact" of a witness' prior conviction but not the nature of that conviction. Thus, the jury learns, for example, that the defendant on trial is a convicted felon but is not told what felony he committed. The mere-fact method permits the State to put before the jury information it needs for evaluating the testifying defendant's credibility. At the same time, that method reduces the prejudice the defendant suffers.

In *Atkinson*, the supreme court rejected the mere-fact method and explained, *inter alia*, as follows:

"Our case law interpreting [*People v. Montgomery*, 47 Ill. 2d 510, 268 N.E.2d 695 (1971),] suggests that it is the nature of a past conviction, not merely the fact of it, that aids the jury in assessing a witness' credibility. [Citations.] The mere-fact approach undermines the *Montgomery* rule and inhibits the jury's evaluation of a witness' credibility by eliminating the jury's consideration of the nature of the past crime." *Atkinson*, 186 Ill. 2d at 458, 713 N.E.2d at 536.

For the reasons set forth in the specially concurring opinion in *People v. Kunze*, 193 Ill. App. 3d 708, 728-36, 550 N.E.2d 284, 297-303 (1990) (Steigmann, J., specially concurring) (which the supreme court in *Atkinson* explicitly referred to as being the source of the mere-fact method (*Atkinson*, 186 Ill. 2d at 457, 713 N.E.2d at 535)), the supreme court is wrong. When a defendant on trial for burglary is impeached with his two prior burglary convictions (as happened in *Atkinson*), the jury is not aided in assessing the defendant's credibility; instead, the defendant is denied his right to a fair trial. The jury in *Atkinson*, when deciding whether the defendant had committed a burglary, could

not likely evaluate the evidence against the defendant fairly once the jury heard of his two prior burglary convictions.

As a second reason for rejecting the mere-fact method of impeachment, the supreme court in *Atkinson* cited "potential prejudice to the defendant." *Atkinson*, 186 Ill. 2d at 459, 713 N.E.2d at 536. Specifically, the court indicated its concern that telling a jury only that defendant was convicted of a felony without providing the exact nature of the offense "unavoidably invites jury speculation about the nature of the prior crime. There is a potential danger that the jury would speculate that the defendant was previously convicted of a more serious crime." *Atkinson*, 186 Ill. 2d at 459, 713 N.E.2d at 536. This objection, of course, is inapposite because it presumes that the mere-fact method is somehow *forced* upon a defendant. However, as explained in the specially concurring opinion in *Kunze*, such a forced situation could never occur because an exception to the use of the mere-fact method exists when "the defendant chooses to have the jury informed of his prior conviction for impeachment purposes in the traditional way, including the name of the offense(s) of which he stands convicted." *Kunze*, 193 Ill. App. 3d at 732, 550 N.E.2d at 300 (Steigmann, J., specially concurring).

The suggestion in *Atkinson* that "the possibility of resulting prejudice to the defendant from revealing the nature of the prior conviction is controlled by the judicial balancing test set forth in the third prong of *Montgomery*" (*Atkinson*, 186 Ill. 2d at 459, 713 N.E.2d at 537) will not provide much solace to defendants who, like the defendant in *Atkinson*, have been deprived of their right to a fair trial. After all, under what circumstances could a panel of the Illinois Appellate Court conclude that a trial court abused its discretion under *Montgomery* by permitting a jury to be told that, for instance, a defendant standing trial for rape had two prior rape convictions when, in *Atkinson*, the supreme court explicitly approved a trial court's *Montgomery* analysis that resulted in a defendant standing trial for burglary being impeached with two prior burglary convictions?

The *Atkinson* approach achieves a reverse "judicial trifecta": everyone loses, the parties as well as the trial courts.

The State is harmed because, in a case in which the defendant's credibility is a legitimate issue, the State may not be permitted to inform the jury, when it evaluates a defendant's credibility, that he is a convicted felon. This will be the result whenever the trial court decides to keep out that prior felony conviction because it is for the same offense for which a defendant is standing trial. Such a defendant will be permitted to testify as if he had no criminal history because the prejudice prong outweighs the probative value.

A defendant is harmed because if the trial court does allow in his prior felony conviction *by name*, he is, for all practical purposes, convicted. Thus, he must either forego testifying or risk being deprived of his right to a fair trial.

Trial courts throughout Illinois are harmed because the supreme court has taken away their discretion to use the mere-fact method when, in their judgment, doing so would be appropriate and fair. Trial courts are thus left with the unhappy choice of depriving a jury of important information it needs when evaluating a defendant's credibility or depriving that defendant of his right to a fair trial.

Courts, like other human institutions, sometimes make mistakes. The Supreme Court of Illinois did so in *Atkinson*. In *Cox*, the court had a chance to undo its mistake but instead embraced it. While the new supreme court may revisit the issue, the citizens of this state may need to look to the real policy-making body of Illinois, the General Assembly, to undo the approach stated in *Atkinson* and to enact the mere-fact method of impeachment by statute, at least to the extent of giving trial courts the discretion to decide whether to use it.